**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. CLAIRE R. KELLY, JUDGE**

---------------------------------------------------------------------- X

CYBER POWER SYSTEMS (USA) INC.    :
                                  :
          **Plaintiff,**          :
                                  :
          *v.*                    :          **Court No. 21-00200**
                                  :
THE UNITED STATES,                :
                                  :
          **Defendants.**         :

---------------------------------------------------------------------- X


## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>


NEVILLE PETERSON LLP
*Counsel for Plaintiff*

John M. Peterson
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com


Dated: March 28, 2025

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT..........................................................................1

STATEMENT OF FACTS ...................................................................................................3

STANDARD OF REVIEW ..................................................................................................6

ARGUMENT .......................................................................................................................7

I.      The Imported Telecommunications Cables are Properly Classified in Subheading
        8544.42.20, HTSUS. .............................................................................................7

        A.      The Subject Cables are of a Class or Kind Principally Used as
                Telecommunications Cables. ....................................................................14

                1.      Use in the Same Manner that Defines the Class ........................14

                2.      General Physical Characteristics................................................15

                3.      The Economic Practicality of So Using the Import ...................15

                4.      The Expectations of the Ultimate Purchasers ...........................16

                5.      The Channels of Trade in which the Merchandise moves. ........16

                6.      The Environment of the Sale, such as Accompanying Accessories and
                        the Manner in Which the Merchandise is Advertised and Displayed........17

                7.      The Recognition in the Trade of this Use .................................17

II.     The Telecommunications Cables are Properly Secondarily Classified in Subheading
        9903.88.56, HTSUS. ...........................................................................................18

CONCLUSION...................................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*ABB, Inc. v. United States*, 28 C.I.T. 1444 (2004)........................................................................ 15

*Amcor Flexibles Kreuzlingen AG v. United States*, 560 F. Supp. 1326 (Ct. Int'l Tr. 2022)........... 8

*American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988) ..................................... 9

*Aromont USA, Inc. v. United States*, 671 F.3d 1310 (Fed. Cir. 2012)........................................... 14

*Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363 (Fed. Cir. 1998) ................................... 6, 7

*Carl Zeiss, Inc. v. United States*, 195 F.3d 1375 (Fed. Cir. 1999)........................................... 8, 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1994)............................................................................... 6

*Chevron Chem. Co. v. United States*, 59 F. Supp. 2d 1361 (Ct. Int'l Tr. 1999) ........................... 7

*Cummins Inc. v. United States*, 454 F.3d 1361 (Fed. Cir. 2006) .................................................. 7

*Cyber Power Sys. (USA) Inc. v. United States*, 586 F. Supp. 3d 1325 (Ct Int'l Tr. 2022). ........ 2, 9

*Dependable Packaging Sols., Inc. v. United States*, 757 F.3d 1374 (Fed. Cir. 2014) ................. 14

*Gray Tool Co. v. United States*, 6 C.I.T. 333 (1983). .................................................................. 21

*J.M. Rodgers & Co. v. United States*, 59 Cust. Ct. 91 (1967). ................................................... 6

*Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984)............................................... 7

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................ 7

*Minnetonka Brands v. United States*, 24 C.I.T. 645 (2000)........................................................ 11

*Orlando Food Corp. v. United States*, 140 F.3d 1437 (Fed. Cir. 1998). ...................................... 8

*Outer Circle Products Inc. v. United States,* 602 F. Supp. 2d 1294 (Ct. Int'l Trade 2009). .......... 9

*Pillowtex Corp. v. United States*, 171 F.3d 1370 (Fed. Cir. 1999) ............................................... 7

*Processed Plastic Co. v. United States*, 29 C.I.T. 1129 (2005) ................................................... 6

*Processed Plastic Co. v. United States*, 473 F.3d 1164 (Fed. Cir. 2006) .................................... 6

*Reliable Contr. Group, LLC v. Dep't of Veterans Affairs*, 779 F.3d 1329 (Fed. Cir. 2015).......... 9

*Rollix Bearing Inc. v. United States*, 15 C.I.T. 11 (1991).............................................................. 6

*Simon Mktg. v. United States*, 29 C.I.T. 1111 (2005) ................................................................... 7

*United States v. Carborundum*, 63 C.C.P.A. 98 (1976). .............................................................. 14

*United States v. Pan Pac. Textile Group Inc.*, 27 C.I.T. 925 (2003) ............................................ 7

*Universal Electronics Inc. v. United States*, 112. F.3d 488 (Fed. Cir. 1997) ............................... 6

**Statutes**

28 U.S.C. § 2640........................................................................................................................... 6

**Other Authorities**

About the International Telecommunication Union (ITU),
   https://www.itu.int/en/about/Pages/default.aspx ................................................................. 12

Amirmohammad Karamzadeh and Alireza Shameli-Sendi, *Reducing Cold Start Delay in*
   *Serverless Computing Using Lightweight Virtual Machines,* Journal of Computer and
   Network Application, December 2024,
   https://www.sciencedirect.com/science/article/abs/pii/S1084804524002078........................... 4

Dicionary.com definition of "telecommunication", Dictionary.com,
   https://www.dictionary.com/browse/telecommunication ......................................................... 11

*Fix Battery Issues,* Verizon,
   https://www.verizon.com/foryourhome/vzrepair/flowengine/UFDService.aspx?Keywor
   d=FIX_BATT ........................................................................................................................ 17

Merriam-Webster Dictionary, definition of "telecommunication", Merriam-
   Webster.com, https://www.merriam-webster.com/dictionary/telecommunication. ................. 11

PowerTec Solutions International, *7P UPS to ONT Blunt End*,
   https://www.powertecsolutions.net/solutions/7p-ups-to-ont-blunt-end-telemetry-cable/ ......... 18

**Regulations**

47 C.F.R. § 2.100 ...................................................................................................................... 12

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. CLAIRE R. KELLY, JUDGE**
-------------------------------------------------------------------- X
CYBER POWER SYSTEMS (USA) INC.    :
                 :
    **Plaintiff,**       :
                 :
    *v.*          :    **Court No. 21-00200**
                 :
THE UNITED STATES,       :
                 :
    **Defendants.**     :
-------------------------------------------------------------------- X

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Cyber Power Systems (USA) Inc., ("Cyber Power"), submits this Motion for Summary Judgment pursuant to Rule 56 of the Rules of the United States Court of International Trade (hereinafter "USCIT R") and respectfully moves this court for an order granting summary judgment in its favor, and awarding the relief sought in this case's Complaint. *See* ECF 11. Specifically, Plaintiff submits that United States Customs and Border Protection ("CBP or Customs") improperly assessed Section 301 duties on plaintiff's imported telecommunications cables, pursuant to subheading 9903.88.03, HTSUS.

During the period from March 20, 2020 to August 7, 2020 CBP classified the telecommunication cables in liquidation under subheading 8544.42.20, Harmonized Tariff Schedule of the United States (HTSUS). This is a duty free provision, however, CBP also assessed a Section 301 duty of 25% *ad valorem* pursuant to Subheading 9903.88.03, HTSUS. Plaintiff protested this determination and argued that the telecommunications cables were properly classified under certain Section 301 exclusions issued by the United States Trade Representative ("USTR"), and codified in Chapter 99, HTSUS. The exclusions exempted certain products from the Section 301 tariff, including telecommunications cables having the characteristics of plaintiff's

imported cables at bar. Subheading 9903.88.33, HTSUS, Chapter 99 Additional U.S. Note 20 (ii) (62) provided the exemption for entries prior to August 7, 2020. Subheading 9903.88.56, HTSUS, Chapter 99 Additional U.S. Note 20 (iii) (205) provides the exemption for entries after August 7, 2020.

CBP denied plaintiff's protest, which led to the filing of this case. During the pleading stage of this litigation, CBP asserted a counterclaim against plaintiff. *See* ECF 14. The agency asserted that the telecommunications cables were properly classified under subheading 8544.42.90, HTSUS, as cables "other" than for telecommunications use, with an additional 2.6% ad valorem duty on top of the already assessed Section 301 duty. This Court redenominated the Government's counterclaim as a defense pursuant USCIT R. 8(d)(2), and held that the Government did not possess statutory authority to assert counterclaim in HTSUS classification litigation. *Cyber Power Sys. (USA) Inc. v. United States*, 586 F. Supp. 3d 1325 (Ct Int'l Tr. 2022). Since that time the parties have engaged in discovery.

Plaintiff now seeks summary judgment holding that all of the telecommunications covered by this action are properly classified under subheading 8544.42.20, HTSUS as "telecommunications cables," and further that the cables are secondarily classified, at the appropriate entry times under either Subheading 9903.88.33, HTSUS, pursuant to the USTR Section 301 exclusion found at Chapter 99 Additional U.S. Note 20 (ii) (62) or subheading 9903.88.56, HTSUS, pursuant to the USTR Section 301 exclusion found at Chapter 99 Additional U.S. Note 20 (iii) (205). Both of these exclusions provides an exception for "Insulated electric conductors for a voltage not exceeding 1,000 V, fitted with connectors of a kind used for telecommunications, each valued over $0.35 but not over $2 (described in statistical reporting

number 8544.42.2000).” This would mean that all of plaintiff's imported telecommunications cables were duty free and the Section 301 duty should be refunded with statutory interest.

## **STATEMENT OF FACTS**

In accordance with USCIT R. 56.3 Statement of Material Facts Not in Dispute is submitted herewith and incorporated by reference.

The instant case involves certain telecommunications cables which CyberPower purchased from a supplier located in the People's Republic of China. There are eight[1] subject telecommunication cables at issue in this action identified as follows: CBL2BUL-004-BLK-CM; CBL7PINBUL-010-CM;      CBL7PIN350BRL-003-BLK;      CBL7PINBUL-002-BLK-CM; CBL7PINBUL-004-CM;    CBL7PINBUL-006-CM;    CBL7PINBUL-006-BLK-CM.    and CBL7PINBUL-004-BLK-CM.

All of the cables at issue are designed to connect a battery backup unit (“BBU”) or uninterruptible power supply (“UPS”) system to an optical network terminal (“ONT”) inside a home or commercial setting. ONTs are the point in the telecommunication system (internet or cable) that fiber optic cables get converted to data.[2] The cables connecting the uninterruptible

---

[1] Although the complaint in this matter identifies seven products and additional product was identified in discovery.

[2] As noted in one source:

The ONT converts fiber network signals from light into copper and electric (Ethernet wiring) for your router to use. The ONT communicates with your provider's fiber network at the Termination Point, or TP, installed by your provider using an optical fiber cable. A LAN or Ethernet cable is used to connect the ONT to your router.

From there, your router allows you to connect your Wi-Fi enabled devices to your home network and connect to the web. Thus, the magic of the internet is spread far and wide, assuming you've got the router to do the job and a reliable power source, of course.

Your ONT will require electricity to provide your fiber services so if you're experiencing internet issues that are unrelated to your router, modem or internet

power supply to the ONT are typically connected manually by an installer or technician from the broadband services provider, such as Verizon. The UPS or BBU provides data through the cables to an ONT regarding various functions, including 12 volt current, 12 volt return, signal, battery status ("ON"), "battery needs to be replaced," "battery is missing," "battery power is low," or cold start protocols.[3] One cable, CBL7PIN350BRL-003 BLK, transmits electrical power only between the ONT and UPS or BBU.

---

provider, check out your ONT to make sure the outlet it's connected to is still in working order. Typically there will be an indicator light on the unit to show that power is present but units vary between providers and regions.

If you have multiple services like TV, phone and internet, the unit will separate and convert those signals accordingly.

*See,* Camryn Smith, *Why Do You Need an Optical Network Terminal?* (April 24, 2024), https://www.allconnect.com/blog/what-is-an-optical-network-terminal (last visited March 28, 2025).

[3] "Cold start protocols" are the procedures for returning service to a device which has been placed in "zero function" to free up other resources in serverless cloud computing. As noted in one article, one of the major challenges in serverless computing operations:

. . . is the cold start delay (Kumar and Thangaraju, 2020). The underlying cause of the cold start delay stems from the practice of scaling down functions to a zero state (Shahrad et al., 2020). This "scalability to zero" approach facilitates a pay-per-use model. Within the framework of Function as a Service (FaaS), functions enter a 'cold' state following a period of inactivity. When a function is 'cold,' the resources allocated to it are relinquished, rendering it unavailable for immediate execution. This design allows cloud service providers to reclaim unused resources for other services, while customers are billed solely when their functions are actively utilized. However, if a request for execution arrives while a function is cold, the request must await the function's reactivation and the allocation of associated resources. Subsequently, the regular execution process resumes, leading to a cumulative delay in the system known as the cold start delay (Manner et al., 2018, Goethals et al., 2018).

Amirmohammad Karamzadeh and Alireza Shameli-Sendi, *Reducing Cold Start Delay in Serverless Computing Using Lightweight Virtual Machines,* Journal of Computer and Network Application, December 2024, https://www.sciencedirect.com/science/article/abs/pii/S1084804524002078 (last visited March 28, 2025).

4

The product specifications for the cables are provided at 56.3 Statement ¶ 5 and 56.3 Statement Ex. C. The cables consist of several common parts of different lengths and size depending on the specific cable. All of the cables feature conductors made of copper, used to carry electrical energy or electromagnetic signals. All of the wires feature insulators composed of polyvinyl chloride (PVC) plastic, these are wrapped around the copper conductors. All of the cables have an outer jacket to protect the cable from environmental conditions and to prevent handlers from suffering electrical shocks. All of the cables have connector plugs composed of molded plastic with metal pins/contacts to connect to the UPS and ONT.

Cyber Power's main customers for these products are telecommunication service providers, such as Verizon. The telecommunication providers provide cable specifications to Cyber Power, which provides the companies with cables to meet their needs.[4] The cables are outfitted with specific pin connectors for connecting to specific models of ONTs. The cables at issue contain either a seven or nine pin connection.  The standards for connectors are provided by ONT designers and suppliers to Cyber Power to verify that the cables will work with specific ONTs. There are generall standards connectors in the industry. Opposite the ONT pin connectors are connectors to plug into the UPS. These include BUL for bullet, BRL for barrel connectors.

All of the cables are designed to be used with a UPS or BBU and are designed to work in the same voltage range as the UPS or BBU. All of the cable connectors which are the subject of this action work at a voltage of less than 1000V.

The value of the imported cables is established through the protest paperwork on file with the Court. *See* ECF 9-1. The invoices related to the specific entries provide the relevant prices. On

---

[4] In many cases, these cables will be used to connect ONTs to UPS units manufactured by Cyber Power.

each entry, there is a subject cable valued between $0.35 and $2.00. The specific breakdown of the invoices is included in the 56.3 Statement, Ex D.

To assist the Court, seven physical samples were mailed for filing and an accompanying Form 23 will be filed on CM/ECF in accordance with USCIT R. 80(h). Plaintiff notes that one product is labeled with a model number from a customer. The CBL7PIN350BRL-002-BLK is identical except for this packaging and label to the sample labeled with model no. 621-00144. Identical samples were sent to the Government in discovery.

## STANDARD OF REVIEW

Customs' classification is subject to *de novo* review pursuant to 28 U.S.C. § 2640. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* USCIT R. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

This Court may resolve a classification issue by means of summary judgment. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (reviewing CBP's classification decision *de novo* on the record made before it, 28 U.S.C. § 2640(a)(1)); *see also, Processed Plastic Co. v. United States*, 29 C.I.T. 1129, 1130 n.4 (2005), *aff'd*, 473 F.3d 1164 (Fed. Cir. 2006). Where there is no genuine dispute as to any material fact, on a motion for summary judgment, CBP will not receive the benefit of a presumption of correctness. *Id.* at 1131, n.5; *see also Universal Electronics Inc. v. United States*, 112. F.3d 488, 491 (Fed. Cir. 1997).[5]

_____

[5] In any event, the government's claimed classification in this case, not having been the classification assigned to the goods in liquidation, would not be entitled to the statutory presumption of correctness. *See Rollix Bearing Inc. v. United States*, 15 C.I.T. 11 (1991); *J.M. Rodgers & Co. v. United States*, 59 Cust. Ct. 91 (1967).

As with all classification issues, fundamentally "[t]he court's duty is to find the *correct result*," *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (emphasis in original), and thus, the ultimate question is "whether the merchandise is properly classified under one or another classification heading." *Simon Mktg. v. United States*, 29 C.I.T. 1111, 1117 (2005) (citation omitted).

Determining the correct classification of merchandise entails a two-step process where the court first construes the relevant classification headings—a purely legal question—and second, the court determines under which of the properly construed tariff terms the merchandise at issue falls. *Bausch & Lomb*, 148 F.3d at 1365; *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999). Where the nature of the merchandise is not at issue, the question collapses entirely into a question of law ripe for disposition on summary judgment. *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006) (citations omitted).

In determining whether a genuine issue of fact exists, the court reviews the evidence submitted and draws all inferences against the nonmoving party. *United States v. Pan Pac. Textile Group Inc*., 27 C.I.T. 925, 927 (2003); *see also, Matsushita Elecs. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). But even if there are "differences in the factual positions advanced by each party," summary judgment remains appropriate unless there are "genuine issues of material fact in dispute." *Chevron Chem. Co. v. United States*, 59 F. Supp. 2d 1361, 1363 (Ct. Int'l Tr. 1999).

## **ARGUMENT**

**I.      The Imported Telecommunications Cables are Properly Classified in Subheading 8544.42.20, HTSUS.**

The imported telecommunications cables are provided for in subheading 8544.42.20, HTSUS and CBP's asserted defense that the products are properly classified in subheading

8544.42.90, HTSUS is incorrect.  We first resolve the classification of the cables within Chapter

84, HTSUS, and then address the application of the exclusion provision in Chapter 99, HTSUS.

These competing provisions are as follows:

### HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

| Chapter 84Heading/ Subheading | Stat. Suffix | Article Description | Column 1 General Duties |
|---|---|---|---|
| 8544 | | Insulated (including enameled or anodized) wire, cable (including coaxial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors or fitted with connectors | |
| | | Other electric conductors, for a voltage not exceeding 1,000 V: | |
| 8544.42. | | Fitted with connectors: | |
| 8544.42.20 | | Of a kind used for telecommunications | Free |
| 8544.42.90 | | Other | 2.6% |

"To determine the meaning of an HTSUS provision, the court applies the GRIs in

numerical order, beginning with GRI 1 and reaching subsequent GRIs if analysis under the

preceding GRI does not yield proper classification of the subject merchandise." *Amcor Flexibles

Kreuzlingen AG v. United States*, 560 F. Supp. 1326, 1330 (Ct. Int'l Tr. 2022). Under GRI 1,

"classification shall be determined according to the terms of the headings and any relative section

or chapter notes." "A court first construes the language of the heading, and any section or chapter

notes in question." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998).

"Absent contrary legislative intent, HTSUS terms are to be construed according to their common

and commercial meanings, which are presumed to be the same." *Carl Zeiss, Inc. v. United States*,

195 F.3d 1375, 1379 (Fed. Cir. 1999). In interpreting the terms of a tariff provision "[a] court may

rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Id.*

The pleadings in the case indicate that the parties agree on the six-digit classification of the cables, but disagree on the proper eight digit classification.  Assertions in an answer are judicial admissions and dispense the need of proof for the allegation. *See Reliable Contr. Group, LLC v. Dep't of Veterans Affairs*, 779 F.3d 1329, 1334 (Fed. Cir. 2015) (citing *American Title Ins. Co. v. Lacelaw Corp*., 861 F.2d 224, 226-227 (9th Cir. 1988)).  Through its now redenominated counterclaim, the Government has admitted in its answer that the parties agree on the proper six digit classification. *See* ECF 14 at Counterclaim ¶ 12.[6] The only remaining issue is whether or not the cables are "of a kind used for telecommunications." Regardless of the pleadings, plaintiff will establish the correct four and six digit classification.

The cables are classified in Heading 8544, HTSUS, pursuant to GRI 1, which states, "for legal purposes, classification shall be determined according to the terms of the headings and any relative Section or Chapter Notes." In addition, *eo nomine* designations are to be construed according to their common and commercial meanings, which are presumed to be the same. *Outer Circle Products Inc. v. United States,* 602 F. Supp. 2d 1294, 1306 (Ct. Int'l Trade 2009). Subheading 8544, HTSUS, provides for:

> Insulated (including enameled or anodized) wire, cable (including coaxial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors or fitted with connectors.

---

[6] The Government's counterclaim was redenominated as a defense pursuant to USCIT R. 8(d)(2). *See Cyber Power Sys. (USA) Inc. v. United States*, 586 F. Supp. 3d 1325 (Ct Int'l Tr. 2022).

The undisputed record puts forth that the cables fit this description. All of the cables contain insulated conductors. *See* 56.3 Statement at ¶4b and Ex. C. Each cable contain a copper wire used to carry electoral energy and electromagnetic signals, each copper wire is insulated with a PVC plastic. *Id.* For classification in this four digit heading, it does not matter whether or not they are fitted with connectors. At the four digit level, these cables are provided for *eo nomine* by Heading 8544, as cables which contain insulated copper wires.

Next we turn to the proper six digit classification, which again the parties do not dispute. Similar to the analysis for the proper four digit heading, the cables fall into subheading 8544.42, because they are provided for *eo nomine*. Subheading 8544.42, HTSUS covers: "Other electric conductors, for a voltage not exceeding 1,000 V: fitted with connectors." Once again the undisputed evidence establishes that the cables are for a use not exceeding 1000V and all of the cables are fitted with a connector. The cables are designed to operate at the supply voltage of 12V from the battery backup. *See* 56.3 Statement at ¶17. All of the cables have a maximum rated voltage of less than 1000 volts. *See* 56.3 Statement at ¶16. In any event, the electrical grid in the U.S. delivers 120V for use in houses and businesses. *See* 56.3 Statement at ¶17. These wire should never encounter more than 120V. *Id.* A voltage of above 1000V is much what large transmission lines between cities and would require a much larger cable for transmission. *Id.* It is also undisputed that all of the cables have connectors. *See* 56.3 Statement at ¶¶4(d), 5 and Ex. B. As such these cables are properly classified in subheading 8544.42, HTSUS.

The eight digit level is where the parties disagree on the classification. The issue is whether the goods are properly classified in subheading 8544.42.20, HTSUS as "of a kind used in telecommunications" or under subheading 8544.42.90, HTSUS, as "other" than cables used in telecommunications. Classification in use provisions "is controlled by the principal use of goods

of that class or kind to which the imported goods belong in the United States at or immediately prior to the date of importation." *See, e.g., Minnetonka Brands v. United States*, 24 C.I.T. 645, 651 (2000). According to U.S. Additional Rule of Interpretation ("ARI") 1 "Principal use is defined as the use which exceeds any other single use of the article." The evidence in this case proves that these cables are principally for use in telecommunications settings.

"Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). In interpreting the terms of a tariff provision "[a] court may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Id.* The subject cables are for use in telecommunications based on the common and commercial meaning of the word.

According to the Merriam-Webster Dictionary the term "telecommunications" means either "communication at a distance (as by telephone)" or "technology that deals with telecommunication."[7] This meaning is consistent with the Dictionary.com definition.[8] In addition, there are international agreements that deal with telecommunications. According to Article 1.3 of the Radio Regulations ("RR"), adopted by the United Nations' International Telecommunications Union ("ITU"),[9] "telecommunication" is defined as "any transmission, emission or reception of

---

[7]     Merriam-Webster Dictionary, definition of "telecommunication", Merriam-Webster.com, https://www.merriam-webster.com/dictionary/telecommunication.

[8]     Dicionary.com definition of "telecommunication", Dictionary.com, https://www.dictionary.com/browse/telecommunication.

[9]     The ITU is "the United Nations specialized agency for digital technologies (ICTs). The Organization is made up of a membership of 194. Member States and more than 1000 companies, universities and international and regional organizations. Headquartered in Geneva, Switzerland, and with regional offices on every continent, ITU is the oldest agency in the UN family – connecting the world since the dawn of the telegraph in 1865." *See* About the International

signs, signals, writings, images and sounds or intelligence of any nature by wire, radio, optical, or other electromagnetic systems." This definition is identical to that contained in Section 1012, Annex to the Constitution and Convention of the International Telecommunication Union (Geneva, 1992). The United States is a signatory to these agreements. *See* 47 C.F.R. § 2.100.

Historically, telecommunication networks were created with copper wires as the physical medium for signal transmission. For many years, these networks were used for basic phone services, namely voice and telegrams. Since the mid-1990s, as the internet has grown in popularity, voice has been gradually supplanted by data. This soon demonstrated the limitations of copper in data transmission, prompting the development of fiber optics for telecommunications. However, some cables, such as the ones at bar, continue to use paired copper cables for the transmission of signals. In order to be classified in this use provision, 8544.42.20, HTSUS, the wires must be for use "communicating at a distance" or with "technology that deals with telecommunication." All of the subject cables fit this commercial description.

Tom Fuehrer, Cyber Power's USCIT R. 30(b)(6) witness and an Electrical Program Manager, testified that the telecommunications cables are solely bought by telecommunications companies such as Verizon. *See* 56.3 Statement at ¶17.  These telecommunications companies are the main customers that purchase these cables. *Id.*  The cables are listed on Cyber Power's website

---

Telecommunication Union (ITU), https://www.itu.int/en/about/Pages/default.aspx (last visited March 28, 2025).

The ITU notes that "technology has become the backbone of modern life. Networks and devices everywhere rely on ITU's work. **Every time we use a mobile phone, send an e-mail, access the Internet, watch TV or streaming services, take a plane**, consult the weather forecast, or use satellite images to navigate or explore, we are relying on ITU's work. 2.6 billion people, largely in developing countries, remain unconnected. ITU works to close this digital divide through universal connectivity and sustainable digital transformation. *See Id*.

as telecommunication cables and are included in the telecommunication section of Cyber Power's catalogues. *See* 56.3 Statement at Ex. C.

Telecommunications companies purchase the cables to install with ONT devices that provide internet and phone services in homes and businesses around the country. *See* 56.3 Statement at ¶ 12.  The cables are used by telecommunication specialist to connect an ONT to a backup battery otherwise known as a UPS or BBU. *See* 56.3 Statement at ¶ 9.  In the event of a power outage or surge the wire communicates this information to the ONT so that it can properly shut down or protect itself. *See* 56.3 Statement at ¶ 11.  This is the only use of these cables, it would be impracticable and nearly impossible to use them in any other setting. *See* 56.3 Statement at ¶ 18. The cables send and receive data between the ONT and the UPS to which they are connected. *See* 56.3 Statement at ¶¶ 8, 10. The cables in this case transfer data regarding the battery information to the ONT and back. *See* 56.3 Statement at ¶¶ 11, 13. They play a vital role in providing battery back up from a UPS in the event of a power failure so that the ONT can continue to operate or safely shut down. *Id.*

Plaintiff notes that the use provision at issue covers "use in telecommunications" and does not require the cable to transmit a specific type of data for classification. These cables are specifically manufactured to connect an UPS to an ONT. The sole purchasers of these cables are telecommunications companies and their sole use is to connect an ONT to a UPS. The use of the subject cables in telecommunication removes them from classification in the Government's proffered basket subheading 8544.42.90, HTSUS.   The cables are properly classified in subheading 8544.42.20, HTSUS.

**A.    The Subject Cables are of a Class or Kind Principally Used as Telecommunications Cables.**

As noted above, subheading 8544.42.20, HTSUS which provides for cables "of a kind used for telecommunications" is a "principal use" provision. In assessing classification under a principal use provision, the court determines whether the group of goods are commercially fungible with the imported goods in order to identify the use that exceeds any other single use. *Dependable Packaging Sols., Inc. v. United States*, 757 F.3d 1374, 1379–80 (Fed. Cir. 2014); *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012). The group of goods at issue under Heading 8544, HTSUS is "insulated electric conductors, whether or not fitted with connectors," and particularly "Other electric conductors, for a voltage not exceeding 1000V" which are "fitted with connectors" and "for use in telecommunications."

 When analyzing whether the subject merchandise are commercially fungible, the Court generally considers the *Carborundum factors*:

> These factors include: use in the same manner as merchandise which defines the class; the general physical characteristics of the merchandise; the economic practicality of so using the import; the expectation of the ultimate purchasers; the channels of trade in which the merchandise moves; the environment of the sale, such as accompanying accessories and the manner in which the merchandise is advertised and displayed; and the recognition in the trade of this use.

*Aromont USA, Inc.*, 671 F.3d at 1313 (citing *United States v. Carborundum*, 63 C.C.P.A. 98, 102 (1976)). Consideration of these factors indicates that the subject tables are of a class used in telecommunications.

**1.    Use in the Same Manner that Defines the Class**

The cables are used to connect telecommunication devices on a network – specifically to connect an optical network terminal (ONT) to an UPS or BBU. *See* 56.3 Statement at ¶9. As Mr.

14

Fuehrer testified, these cables have no other use. *See* 56.3 Statement at ¶14. Cyber Power's

Catalog, which identifies these cables as "telecommunications" cables, states:

> CyberPower Cable Assemblies provide connectivity between CyberShield™ DC battery
> backup systems, power adapters, and Optical Network Terminals (ONT). These cable
> assemblies are specifically designed for ONT, broadband applications, cable telephony,
> wireless local loop (WLL), fiber to the home (FTTH), VoDSL applications, and Integrated
> Access Devices (IAD) for customer premises equipment (CPE).

*See* 56.3 Statement at Ex. C at 4. All of these uses are telecommunications uses.

### 2.    General Physical Characteristics

The Explanatory Notes to Heading 8544: elaborate on that products are contained therein:

"telecommunications wires and cables (including submarine cables and data transmission wires

and cables)," which "are generally made up of a pair, a quad or a cable core, the whole usually

covered with a sheath." *Harmonized Commodity Description and Coding System Explanatory

Notes*, 85.44 (2d ed. 2002). *See ABB, Inc. v. United States*, 28 C.I.T. 1444, 1449 (2004).

As noted in plaintiff's Rule 56.3 statement and exhibits, the subject cables have the

physical characteristics of telecommunication cables. *See* 56.3 Statement at ¶4, and Ex. B. They

generally have paired cores, with a signal wire and an electrical power wire, they are covered with

a PVC insulating sheath, and covered with an outer jacket to protect the conductors from the

environment. As such, all of the cables possess the general physical characteristics of

telecommunication cables.

### 3.    The Economic Practicality of So Using the Import

The economic practicality of using the imported cables in telecommunications uses is not

in dispute. As noted below, the subject cables are valued at between $0.35 and not more than $2.00

apiece. *See* 56.3 Statement at Ex. D. They are used to make connections between much more

expensive telecommunications system components, including ONTs and UPS or BBU. *See* 56.3

Statement at ¶ 9. They are purchased and used in large quantities by telecommunications service providers. *See* 56.3 Statement at ¶ 14.

### 4.    The Expectations of the Ultimate Purchasers

As indicated in Mr. Fuehrer's deposition, the ultimate purchasers in this case are telecommunications service providers, who use the cables to connect particular ONT devices to particular UPS devices. *See* 56.3 Statement at ¶¶ 14, 18. The ONTs require connections having a certain number of pins, and a terminal suited to connect with the particular model of UPS at issue. *See* 56.3 Statement at ¶¶ 20-21. These products fully satisfy the expectations of the ultimate purchasers, the telecommunications service providers, who dictate the specifications they require the cables to meet.

### 5.    The Channels of Trade in which the Merchandise moves.

The channels of trade in which the merchandise move are specific to the needs of the telecommunications service industry. While Cyber Power offers the cables for sale on its website, the prices are set much higher than the price at which they can be obtained from wholesale distributors of telecommunications support equipment. *See* 56.3 Statement at ¶ 22.  In contrast to many of Cyber Power's other products, such as surge voltage protectors, which are sold to and through distributors and retail outlets, such as The Home Depot or Walmart, these cables are not generally offered for retail sale. *See* 56.3 Statement at ¶ 14. This is because if, for example, a cable broadband customer had a problem with the connection to their ONT, they would not attempt to purchase a replacement cable, but would expect the broadband utility to repair or replace it, since the ONT is generally the utility's property.

Verizon, for example, lets customers know how to make simple corrections to the ONT

and battery connection, and indicates that the utility will send an agent to perform repairs if needed:

> Use the Verizon Troubleshooter to quickly resolve troubles including loss of
> power to the Battery Backup Unit, replacing and disposing of the battery and
> silencing the beeping alarm.

> You can do all that and more, without waiting for a live agent!

> You can expect to fix most issues in the troubleshooter in under five minutes. If
> you need further assistance we will connect you to an agent.

*Fix                              Battery                              Issues,*                              Verizon,

https://www.verizon.com/foryourhome/vzrepair/flowengine/UFDService.aspx?Keyword=FIX_B

ATT. (last visited March 28, 2025).

> **6.      The Environment of the Sale, such as Accompanying Accessories and
>             the Manner in Which the Merchandise is Advertised and Displayed**

The environment of sale of these products is a strictly business-to-business sales model.

While Cyber Power lists the cables on their website, they do not offer these products at retail or to

the general public. *See* 56.3 Statement at ¶¶ 14 and 22. The cables are sold in boxes containing

large quantities of cables each, a quantity suitable for a broadband installer, but unnecessary for a

retail customer. *Id.* The goods are sold in an environment suitable to procurement by a

telecommunications services providers.

> **7.      The Recognition in the Trade of this Use**

The use of these cables in the telecommunications trade is well recognized. Broadband

providers all offer ONT terminals to receive telecommunications signals into a house or other

facility, and all offer battery backups. *See* 56.3 Statement at ¶ 14.  Cables of this kind are needed

to make connections between these components. The use of these types of cables for

telecommunications uses is well established. Other companies offer power supply backups for ONTs and the cable to connect the power supply and ONT. *See, e.g.,* PowerTec Solutions International, 7P UPS to ONT Blunt End, https://www.powertecsolutions.net/solutions/7p-ups-to-ont-blunt-end-telemetry-cable/  (last visited March 28, 2025). These products are recognized for their use in this trade and are listed in Cyber Power's catalog and website as telecommunication cables. *See* 56.3 Statement at ¶ 19. The telecommunication providers approach Cyber Power to purchase these cables for the specific use of connecting an ONT to an UPS or BBU.  *See* 56.3 Statement at ¶ 20.

## II.    The Telecommunications Cables are Properly Secondarily Classified in Subheading 9903.88.33 or 9903.88.56, HTSUS.

At relevant times, subheadings 9903.88.33, HTSUS and 9903.88.56, HTSUS provided an exclusion from Section 301 China retaliatory tariffs for "Insulated electric conductors for a voltage not exceeding 1,000 V, fitted with connectors of a kind used for telecommunications, each valued over $0.35 but not over $2 (described in statistical reporting number 8544.42.2000)."

The above analysis, and plaintiff's Rule 56.3 statement demonstrates that all of the subject cables are insulated electrical conductors "of a kind used for telecommunications" and have a primary classification in subheading 8544.42.20, HTSUS.[10]  All that remains is to establish that the cables (i) do not exceed 1,000V; (ii) are fitted with connectors of a kind used for telecommunications; and (iii) are valued over $0.35 but not over $2. As established below, the cables meet all of the exclusion's requirements.

---

[10] The exclusions reference statistical reporting number 8544.42.2000. There is only a single ten digit statistical subheading under subheading 8544.42.20, HTSUS of 00. For all practical purposes subheadings 8544.42.20, HTSUS and subheading 8544.42.2000, HTSUS are the same.

As the pleadings in this case indicate, the parties agree on the proper digit classification of this product under subheading 8544.42, HTSUS. This provision provides for:

| Heading/ Subheading | Stat. Suffix | Article Description | Column 1 General Duties |
|---|---|---|---|
| 8544 | | Insulated (including enameled or anodized) wire, cable (including coaxial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors or fitted with connectors | |
| | | Other electric conductors, for a voltage not exceeding 1,000 V: | |
| 8544.42. | | Fitted with connectors: | |

The Government's Answer in this action indicates the Government's agreement that the wires are insulated, for a voltage not to exceed 1,000V and fitted with connectors, as these are requirements for classification in subheading 8544.42, HTSUS. Regardless, the record in this case demonstrates that the cables meet all the requirements of the Section 301 exclusions.

Each cable contain a copper wires used to carry electoral energy and electromagnetic signals, each copper wire is insulated with a PVC plastic sheath. *See* 56.3 Statement at ¶ 4a, and Ex. B.   The evidence also establishes that the cables are for a use not exceeding 1000V and all of the cables are fitted with a connector. *See* 56.3 Statement at ¶ 16, and Ex. B. The cables are designed to operate at the supply voltage of 12V from the battery backup. *See* 56.3 Statement at ¶ 17. None of the cables have a maximum voltage of greater than 1000V. *See* 56.3 Statement at ¶ 16. As mentioned earlier, a voltage of above 1000V is much what large transmission lines between cities and would require a much larger cable for transmission. *See* 56.3 Statement at ¶ 17. These wires are not for such use.

The next prong is that the cables be "fitted with connectors of a kind used for telecommunications." As established earlier, the term telecommunication means communicating at a distance" or with "technology that deals with telecommunication." Each of the cables at issue has a seven or nine pin connector for use connecting to an ONT. *See* 56.3 Statement at ¶ 20. The standards for the seven and nine pin connectors are provided by ONT suppliers to Cyber Power to verify that the cables will work with specific ONTs. *Id*. At the other end of the wire are either a bullet or barrel connector. *See* 56.3 Statement at ¶ 21. These connectors are generally standards connectors in the industry. *Id.* These connectors connect the cable into the UPS or BBU and the ONT. The cables seven or nine pin connector, bullet or barrel connectors are a connector of a kind used in telecommunication. As such the cables meet the third requirement of the exclusion and have "connectors of a kind used in telecommunications."

The final prong is that the cables be valued "over $0.35 but not over $2". This value is established by the invoices and purchases order for the merchandise at issue. The values for various imports can be found in the entry documents and associated invoices in the protest file of this case. All of the model at issues have importations in the associated entries valued between $0.35 and $2.00. Some of the entries contain subject merchandise outside of the range, plaintiff does not seek a refund as to these cables. As break down of these values is available in 56.3 Statement at Ex. D, which references the specific page number this cases protest file, ECF 9, where the related invoice can be found.

Plaintiff notes that Customs has determined the appraised value of the merchandise at bar and has liquidated the entry with a final determination of appraised value. No protest was filed in respect of the determination of appraised value of this merchandise. The appraised value determination has accordingly become final and non-contestable. *See Gray Tool Co. v. United*

*States*, 6 C.I.T. 333 (1983). Furthermore, defendant has no cause of action to revisit the final liquidated determination regarding dutiable value as 19 U.S.C. § 1401a appraisement is not at issue in this case. The issue is whether the merchandise fits into the Section 301 exclusion found at 9903.88.33, HTSUS.

**<u>CONCLUSION</u>**

For the reasons set out herein, Plaintiff submits that summary judgment should be entered in its favor and its protest sustained.

Respectfully submitted,

NEVILLE PETERSON LLP
*Counsel for Plaintiff*

<u>/s/ John M. Peterson</u>
John M. Peterson
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated: March 28, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. CLAIRE R. KELLY, JUDGE**

```
------------------------------------------------------------------ X
```
CYBER POWER SYSTEMS (USA) INC.                    :
                                                  :
      **Plaintiff,**                                :
                                                  :
      *v.*                                         :        **Court No. 21-00200**
                                                  :
THE UNITED STATES,                                :
                                                  :
      **Defendants.**                              :
```
------------------------------------------------------------------ X
```

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, Patrick B. Klein, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 6,169 words.

              Respectfully submitted,

              /s/ Patrick B. Klein
              Patrick B. Klein