UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. CLAIRE R. KELLY, JUDGE

———————————————————————
                                                    :
CYBER POWER SYSTEMS (USA) INC.,                     :
                                                    :
                          Plaintiff,                :
                                                    :
              v.                                    :        Court No. 21-00200
                                                    :
UNITED STATES,                                      :
                                                    :
                          Defendant.                :
———————————————————————:

## **ORDER**

Upon consideration of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, and upon consideration of all other papers and proceedings had herein; it is hereby

**ORDERED** that plaintiff's motion for summary judgment is denied; and it is further

**ORDERED** that defendant's motion for summary judgment is granted; and it is further

**ORDERED** that U.S. Customs and Border Protection shall reliquidate the entries of the subject merchandise before the Court under subheadings 8544.42.90/9903.88.03 of the Harmonized Tariff Schedule of the United States (HTSUS) at a duty rate of 2.6 percent *ad valorem* and subject to Section 301 duties; and it is further

**ORDERED** that plaintiff shall pay all additional duties, taxes, and fees determined to be due on reliquidation, with interest as provided for by law, including but not limited to interest pursuant to 19 U.S.C. § 1505(b) and (c), and post-judgment interest; and it is further

**ORDERED** that this action is dismissed.

                                        ———————————————————————
                                              CLAIRE R. KELLY, JUDGE

Dated: ———————————————
          New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. CLAIRE R. KELLY, JUDGE

_____
                                          :
CYBER POWER SYSTEMS (USA) INC.,           :
                                          :
                    Plaintiff,            :
                                          :
            v.                            :    Court No. 21-00200
                                          :
UNITED STATES,                            :
                                          :
                    Defendant.            :
_____ :

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel:*

VALERIE SORENSEN-CLARK
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

MATHIAS RABINOVITCH
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484
*Attorneys for Defendant*

June 27, 2025

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 2

BACKGROUND ................................................................................................................ 3

    A. Description of the Subject Merchandise ................................................................ 3

        1. Technical Specifications of the CBL2BUL Cables ...................................... 5

        2. Technical Specifications of the CBL7PIN350BRL Cables ......................... 6

        3. Technical Specifications of the CBL7PINBUL Cables ................................ 6

    B. Procedural Background ............................................................................................ 7

QUESTIONS PRESENTED ............................................................................................... 9

SUMMARY OF ARGUMENT .......................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I. Legal Framework ....................................................................................................... 11

    A. Legal Standard for Summary Judgment ............................................................... 11

    B. Legal Standard for Classification .......................................................................... 11

    C. Heading 8544 and Note 20(ll)(61) to Chapter 99 ................................................ 13

II. Cyber Power's Cables Are Power Cables And Therefore Not Classified in Subheading
    8544.42.42 as Cables "of a Kind Used for Telecommunications" ........................... 15

    A. The Subject Cables Are Not of a Kind Used for Telecommunications ................. 15

        1. Cables of a Kind Used for telecommunications Function with the Purpose of
           Transmitting and Receiving Information ................................................... 17

        2. The Subject Cables Do Not Belong to a Class or Kind of Merchandise That Is
           Principally Used for Telecommunications .................................................. 19

           a. The Use in a Manner That Defines the Class (Actual Use) ................. 19

           b. The General Physical Characteristics of the Merchandise .................. 20

           c. The Economic Practicality of So Using the Import ............................. 21

     d.   The Expectations of the Ultimate Customers ........................................................ 22

     e.   The Channels of Trade in Which the Merchandise Moves ................................. 23

     f.   The Environment of Sale ................................................................................... 23

     g.   The Recognition in the Trade of the Use .......................................................... 24

  B.  Plaintiff Misinterprets the Phrase "Used for Telecommunications"............................... 25

  C.  The Subject Cables Are Other Than Those of a Kind Used for Telecommunications.... 28

III. Cyber Power's Cables Do Not Meet the Terms of Note 20(ll)(61) Because they Are Not Classified in Subheading 8544.42.90........................................................................................ 28

IV. This Court Should Order the Reliquidation of the Subject Cables under Subheading 8544.42.90 and Order Cyber Power to Pay All Additional Duties......................................... 30

CONCLUSION........................................................................................................................ 32

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................. 11

*Aromont USA, Inc. v. United States*,
671 F.3d 1310 (Fed. Cir. 2012) ..................................................................... 17, 19, 24

*Bausch & Lomb, Inc. v. United States*,
148 F.3d 1363 (Fed. Cir. 1998) ............................................................................... 12

*BenQ Am. Corp. v. United States*,
646 F.3d 1371 (Fed. Cir. 2011) ......................................................................... 12, 17

*Carl Zeiss, Inc. v. United States*,
195 F.3d 1375 (Fed. Cir. 1999) ............................................................................... 12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................. 11

*Clarendon Mktg., Inc. v. United States*,
144 F.3d 1464 (Fed. Cir. 1998) ............................................................................... 16

*Cyber Power Systems (USA) Inc. v. United States*,
586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022) ................................................... 9, 30, 31

*GRK Canada, Ltd. v. United States*,
180 F. Supp. 3d 1260 (Ct. Int'l Trade 2016)
*aff'd*, 885 F.3d 1340 (Fed. Cir. 2018) ...................................................................... 16

*Jarvis Clark, Inc. v. United States*,
733 F.2d 873 (Fed. Cir. 1984) ....................................................................... 15, 30, 31

*Keystone Auto. Operations, Inc. v. United States*,
732 F. Supp. 3d 1339 (Ct. Int'l Trade 2024) ..................................................... 12, 13

*Lenox Collections v. United States*,
20 C.I.T. 194 (1996) ................................................................................................ 17

*Maple Leaf Mktg., Inc. v. United States*,
528 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ........................................................... 13

*Millennium Lumber Distribution Ltd. v. United States*,
558 F.3d 1326 (Fed. Cir. 2009) ............................................................................... 12

*Minnetonka Brands, Inc. v. United States*,
110 F. Supp. 2d 1020 (Ct. Int'l Trade 2000) .......................................................... 12

*N. Am. Processing Co. v. United States*,
236 F.3d 695 (Fed. Cir. 2001) ................................................................................. 12

*Primal Lite, Inc. v. United States*,
22 C.I.T. 697 (1998)
*aff'd*, 182 F.3d 1362 (Fed. Cir. 1999) ........................................................ 15, 16, 19

*RKW Klerks Inc. v. United States*,
592 F. Supp. 3d 1349 (Ct. Int'l Trade 2022)
*aff'd*, 94 F.4ᵗʰ 1374 (Fec. Cir. 2024) .................................................................. 11, 12

*Sarne Handbags Corp. v. United States*,
100 F. Supp. 2d 1126 (Ct. Int'l Trade 2000) .......................................................... 13

*Second Nature Designs Ltd. v. United States*,
654 F. Supp. 3d 1301 (Ct. Int'l Trade 2023) .......................................................... 31

*United States v. Carborundum Co.*,
63 CCPA 98, 536 F.2d 373 (1976) ..................................................................*passim*

**Harmonized Tariff Schedule Of The United States**

General Rule of Interpretation 1 ................................................................... 10, 12, 15

Additional Rule of Interpretation 1 .............................................................. 15, 16

Additional Rule of Interpretation 1(a) ......................................................... 16, 17

**Chapter 85**

Heading 8504

Subheading 8504.40.85 .......................................................................................... 26

Subheading 8504.50.40 .......................................................................................... 26

Heading 8544 ................................................................................................... 13, 14

Subheading 8544.42 ........................................................................................ 13, 28

Subheading 8544.42.20 ..................................................................................*passim*

Subheading 8544.42.2000 ........................................................................... 8, 14, 28

Subheading 8544.42.90 .................................................................................................... *passim*

**Chapter 99**

Heading 9903

Subheading 9903.88.03 .................................................................................... 1, 14, 30

Subheading 9903.88.33 ............................................................................................ 8, 14

Note 2 ............................................................................................................................ 13

U.S. Note 20(ll)(61) ................................................................................................ *passim*

U.S. Note 20 (vvv)(iii)(61) ............................................................................................ 21

U.S. Note 20(ss)(35) ............................................................................................... 26, 27

**Statutes**

19 U.S.C. § 2411 ............................................................................................................. 8

28 U.S.C. § 1581 ........................................................................................................... 30

28 U.S.C. § 2643 ........................................................................................................... 30

28 U.S.C. § 2643(a)(1) .................................................................................................. 30

28 U.S.C. § 2643(b) ................................................................................................ 30, 31

28 U.S.C. § 2643(c)(1) .................................................................................................. 30

Section 301 of the Trade Act of 1974 ..................................................................... *passim*

**Rules**

USCIT R. 56 ..................................................................................................................... 1

USCIT R. 56(a) .............................................................................................................. 11

**Regulations**

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
83 Fed. Reg. 47,974 (Sept. 21, 2018) .................................................................... 8, 14

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
84 Fed. Reg. 20,459 (May 9, 2019) ......................................................................... 8, 14

*Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
84 Fed. Reg. 57, 803 (Oct. 28, 2019) ........................................................................... 14

**Other Authorities**

ADTRAN 602x/621i/622, Precision Group,
https://goprecisiongroup.com/product/adtran-602x-621i-622-other-cable-assembly-pp7p5521-x ................................................................................................................. 24

*Communication*, Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary/communication ................................... 17

*For*, Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary/for ....................................................... 26

*Fungible,* Black's Law Dictionary (11th ed. 2019) ..................................................... 19

*In*, Cambridge Dictionary,
https://dictionary.cambridge.org/dictionary/english/in ................................................ 26

*Power adapter*, PCMag.com,
https://www.pcmag.com/encyclopedia/term/power-adapter ........................................ 20

PS7PCDIN Series, PowerTec Solutions International,
https://www.powertecsolutions.net/solutions/ps7pcdin-series-calix-716-i-and-836ge-telemetry-cable/ .......................................................................................................... 24

*Telecommunications*, Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary/telecommunication ............................. 17

*Telecommunications*, Cambridge Dictionary,
https://dictionary.cambridge.org/us/dictionary/english/telecommunications ......... 17, 18

*Telecommunications*, Oxford: A Dictionary of Electronics and Electrical Engineering, (5th ed. 2018)
https://www.oxfordreference.com/display/10.1093/acref/9780198725725.001.0001/acref-9780198725725-e-4658 ................................................................................... 17, 18

*Telecommunications*, Oxford: A Dictionary of Physics (8th ed. 2019)
https://www.oxfordreference.com/display/10.1093/acref/9780198821472.001.0001/acref-9780198821472-e-3020 ....................................................................................... 18

*Telecommunications*, Oxford: A Dictionary of Media and Communications (3d ed. 2020)
https://www.oxfordreference.com/display/10.1093/acref/9780198841838.001.0001/acref-
9780198841838-e-2735 ........................................................................................................... 18

*Trailer Wiring Diagram*, e-trailer.com,
https://www.etrailer.com/faq-wiring.aspx# .......................................................................... 21

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. CLAIRE R. KELLY, JUDGE

———————————————————————————
                                                    :
CYBER POWER SYSTEMS (USA) INC.,                     :
                                                    :
                        Plaintiff,                  :
                                                    :
            v.                                      :    Court No. 21-00200
                                                    :
UNITED STATES,                                      :
                                                    :
                        Defendant.                  :
———————————————————————————:

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the United States Court of International Trade (USCIT), defendant, the United States (the Government), respectfully cross-moves this Court for an order: (1) denying plaintiff Cyber Power Systems (USA) Inc. (Cyber Power)'s motion for summary judgment; (2) granting summary judgment in the Government's favor; (3) ordering reliquidation of the subject merchandise under subheadings 8544.42.90/9903.88.03 of the Harmonized Tariff Schedule of the United States (HTSUS), at a duty rate of 2.6 percent *ad valorem* and subject to Section 301 duties; (4) ordering Cyber Power to pay all additional duties, taxes, and fees determined to be due on reliquidation, with interest as provided for by law, including but not limited to interest pursuant to 19 U.S.C. § 1505(b) and (c), and post-judgment interest; and (4) granting the Government such other and further relief as may be just and appropriate.  As we demonstrate below, summary judgment in favor of the Government is appropriate because there are no genuine disputes of material fact, and the Government is entitled to judgment as a matter of law.

## <u>INTRODUCTION</u>

This case concerns cables used by broadband service providers to connect power to its Optical Network Terminals (ONTs) from Cyber Power's battery backup units (BBUs) or uninterruptable power supplies (UPSs) (collectively, battery backup devices).  An ONT, sometimes referred to as a fiber box, is a device that converts fiber optical signals in a service provider's network to electrical signals used by electronic devices, such as those in a home or office.  Like all electronic devices, an ONT needs power, in the form of electricity, to function. One option is to plug the ONT directly into a power outlet using a standard power cable.  But to protect against power outages or disruptions, Cyber Power provides battery backup devices that act as an intermediary between the power supply and the ONT.  This provides steady power to the ONT in case of any disruption in the power supply.  In this configuration, the power is supplied to the ONT from the battery backup device using the imported cables at issue.

Cyber Power claims that its imported cables are classified as cables for telecommunications, which are cables used to transfer, transmit, and receive information.  Cyber Power thus asks the Court to classify the merchandise under subheading 8544.42.20, HTSUS, which provides for cables, wires, or other electrical conductors, for voltages not exceeding 1,000 volts, fitted with connectors, of a kind used for telecommunications.  However, as the undisputed facts show, the imported cables are principally used to transmit power, not information. Therefore, they are not cables of the kind used for telecommunications.  Given their use, they are properly classified under subheading 8544.42.20, HTSUS, as insulated wires, cables, or other insulated electric conductors, for voltages not exceeding 1,000 volts, fitted with conductors, that are other than those of a kind used for telecommunications.

## BACKGROUND

### A.  Description of the Subject Merchandise

This case concerns cables of various lengths fitted with one of three types of connectors at each end.  *See* Gov't Statement of Additional Undisputed Material Facts ("Gov't SOF") ¶¶ 13–39.  Each cable consists of several conductors of copper wire that are insulated with a polyvinyl chloride ("PVC") cover.  Gov't SOF ¶ 14.  This cover is color-coded in red, black, gray, or other colors.  *Id.*  The insulated conducting wires are further insulated by an outer jacket, also made of PVC.  Gov't SOF ¶ 15.  Each end of the cable is terminated with a connector.  Gov't SOF ¶ 16.

The cables are designed to plug one of Cyber Power's battery backup devices or power adapters to an internet service provider's optical network terminal.  *See* Pl.'s 56.3 Statement of Material Facts Not In Dispute ("Pl.'s SOF") ¶ 5; Def.'s Responses to Pl.'s R. 56.3 Statement of Material Facts Not In Dispute ("Gov't RSOF") ¶ 5.  The battery backup devices provide uninterrupted power supply to the ONT during a power outage or other disruption to the power supply.  *See* Gov't SOF ¶¶ 1, 7.  The battery backup devices are plugged into the utility power supply, which typically carries 120-volts of alternating current (AC).  Gov't SOF ¶ 5.  The battery backup systems then convert the 120-volt AC power to a 12-volt direct current (DC) that is received by the ONT.  Gov't SOF ¶ 6.  The battery backup device provides continuous power to a specific ONT using one of the subject cables.  Gov't SOF ¶ 7.  No other cables are connected to the battery backup device, other than the cable providing power to the device and the cable providing power to the ONT.  *Id.*  The ONTs can also be plugged directly to the utility power supply with a standard power cable, which would be used instead of the subject cables with the battery backup devices.  Gov't SOF ¶ 8.  When the subject cables are connected to the

ONT, no other cable provides power to it.  *Id.*  In short, the subject cables power the ONTs, which is needed for the ONT to function.  *See* Gov't SOF ¶ 7.

The cables transmit power using two wires in the cables.  Gov't SOF ¶ 17.  One wire, the live or hot wire, transmits the electrical current required by the ONT; the other wire, the return wire, completes the circuit required for the power transmission.  *Id.*  Some of the cables, described further below, can also transmit information to the ONT regarding the status of the power supply coming from the battery backup using a signal wire.  *See* Gov't SOF ¶¶ 19, 29, 30.  The ONT can then transmit battery status information to the service provider.  Gov't SOF ¶ 36.  These are the only signals transferred through the wires.  Gov't SOF ¶ 30.

Once powered, the ONT functions to convert the fiber optic light in a fiber optic cable from the service provider's network to an electrical signal that can be received by other electronic devices, such as a computer.  Gov't SOF ¶ 9.  These signals can be transmitted from the ONT to other devices using an Ethernet cable or through Wi-Fi using a gateway (or router).  *Id.*  The ONT also converts electrical signals from these devices back to fiber optic light waves.  Cyber Power works with various manufacturers of ONTs and various service providers.  *See* Gov't SOF ¶¶ 1, 3, 10–11.  Although Cyber Power sells a cable to a specific service provider based on the specifications required by that provider, there is a "standard connection for the power cables."  Gov't SOF ¶ 10 (Pl.'s SOF Ex. A (USCIT Rule 30(b)(6) Deposition of Thomas Fuehrer ("Fuehrer Dep.") at 33:11-12).  Thus, the subject cables could be used with another provider's ONT, even though some "optical network devices are designed with different types of power connectors."  *See* Gov't SOF ¶¶ 11, 12.

There are seven models of cables at issue.  Gov't SOF ¶ 13.  They differ based on their length, color of the outer jacket, number of conducting wire, and type of connectors at each end

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

of the cable.  *See* Gov't SOF ¶¶ 18–39.  The connectors are all "male" connectors, *see* Pl.'s SOF ¶ 5; Gov't RSOF ¶5, meaning that they are designed to be plugged into a corresponding socket in the battery backup device or the ONT.  These cables can be grouped into three types that share characteristics relevant to this action, identified by following model series: (1) "CBL2BUL," (2) "CBL7PIN350BRL," and (3) "CBL7PINBUL."  There is only one model of the CBL2BUL and CBL7PIN350BRL cables, and six models of the CBL7PINBUL cables.[1]  Cyber Power is the original designer for the CBL2BUL and CBL7PINBUL cables, with specifications provided by Verizon.  Gov't SOF ¶ 43.  Cyber Power designed the specifications for the CBL7PIN350BRL cable.  Gov't SOF ¶ 44.  In a response to a Request For Proposal (RPX) from Verizon, Cyber Power described the CBL2BUL and CBL7PINBUL cables as meeting specifications for an [["▮▮▮▮▮▮▮▮▮▮▮▮▮▮"]].  Gov't SOF ¶ 45.

    1.  Technical Specifications of the CBL2BUL Cables

The CBL2BUL cables (the "BUL cables") at issue are four feet long and terminated with the same 9-pin male DIN[2] connector at each end.  Gov't SOF ¶¶ 18, 20.  The terms "9-pin" means that it contains nine contact points.  Gov't SOF ¶ 20.  The BUL cables contain only three conductors of bare copper wires.  Gov't SOF ¶ 19.  Two of the wires have a diameter of 16 AWG (American Wire Gauge) and one has a diameter of 24 AWG.  *Id.*  Under the AWG logarithmic standard for wire gauge, a lower number represents a thicker wire.  *Id.*  The two thicker wires are each connected to two of the pins in the connector and transmit the power to the

---

[1]  The six models of the type 3 cables differ only in their length, the color of the outer jacket, or the distance between the contacts in the connector.  Gov't SOF ¶¶ 28–39.

[2]  DIN stands for Deutsches Institut für Normung, referring to an international standard that defines the shape of the connector, the number of pins, and dimensions associated with it. Gov't SOF ¶ 20.

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

ONT. *Id.* The thinner wire carries a signal.[3] *Id.* Electrical testing showed that the cable's insulation resists up to 400 volts of DC power, but the cable is labeled as resisting up to 300 volts. Gov't SOF ¶ 21. The cables are "designed to connect a power adapter to a desktop ONT." *See* Gov't SOF ¶ 22; *see also* Conf. Gov't Ex. D at Bates 00435 (stating that [[███████████ ████████████████████████████████████████████ ███████████████ ]]).

2.  Technical Specifications of the CBL7PIN350BRL Cables

The CBL7PIN350BRL cables (the "BRL cables") at issue are three feet long and are terminated at one end with a male 7-pin connector and at the other end with a male 5.5*2.5DC barrel connector. Gov't SOF ¶¶ 23, 25. The 7-pin connector connects to Cyber Power's battery backup unit and the barrel plug connects to the ONT. Gov't SOF ¶ 25. The BRL cables only contain two conductors of tinned copper wire measuring 20 AWG in diameter. Gov't SOF ¶ 24. These wires transmit the power from the battery backup device to the ONT. *Id.* This cable contains no other conducting wire. *Id.* Electrical testing showed that the cable's insulation resists up to 400 volts of DC power, but the cable is labeled as resisting up to 300 volts. Gov't SOF ¶ 26. These cables are marketed as "designed to connect a battery backup system to a desktop ONT." Gov't SOF ¶ 27.

3.  Technical Specifications of the CBL7PINBUL Cables

The CBL7PINBUL cables (the "7PIN cables") at issue range from two feet to ten feet long and are terminated at one end with the 7-pin connector and with the 9-pin male DIN connector at the other end. Gov't SOF ¶¶ 28, 37. Like the previous model, the 7-pin connector

---

[3] Verizon described the characteristic of this cable [["███████████████████████████████ ████ ]] *See* Conf. Gov't Ex. D (FTTP Cable Assembly Specification) at Bates 00436.

connects to Cyber Power's battery backup unit, while the 9-pin plug connects to the ONT.  Gov't SOF ¶ 37.  The 7PIN cables contain seven conductors of bare copper wires.  Gov't SOF ¶ 29.  Like the BUL cables, two of the wires have a diameter of 16 AWG and the other five have a diameter of 24 AWG.  *Id.*  Again, like the BUL cables, the two thicker wires transmit the power to the ONT and the thinner wires transmit a specific signal to the ONT about the status of the battery.  *Id.*  The battery status signal transmitted by this cable is identified as follows: "on battery," "replace battery," "battery missing," and "low battery."  Gov't SOF ¶ 30.  The "on battery" signal tells the ONT that the device is providing power from its battery.  Gov't SOF ¶ 31.  The "replace battery" signal indicates to the ONT that the battery has reached the end of its service life and needs to replaced.  Gov't SOF ¶ 32.  The "battery missing" signal notifies the ONT that there is no battery installed in the device.  Gov't SOF ¶ 33.  And the "low battery" signals to the ONT that the battery in the backup device is low, typically below 20 percent of its full charge.  Gov't SOF ¶ 34.  The fifth signal wire is a return wire for the other signal transmissions.  Gov't SOF ¶ 35.  Electrical testing showed that the cable's insulation resists up to 400 volts of DC power, but the cable is labeled as resisting up to 300 volts.  Gov't SOF ¶ 38.  These cables are marketed as "designed to connect a battery backup system to a 7-pin adapter."[4]  Gov't SOF ¶ 39.

### B.  Procedural Background

Cyber Power imported the subject cables under cover of ten entries made at the port of Minneapolis, Minnesota between May 27, 2019 through September 20, 2019.  At entry, Cyber

---

[4]  Cyber Power's website (Pl.'s Ex. C) appears to mistakenly state that the battery backup device is connected to the 7-pin adapter.  Cyber Power testified that the 7-pin connector is plugged into the battery backup device, and the 9-pin DIN connector is plugged into the ONT. This also comports with Cyber Power's testimony that the 9-pin DIN connector is a standard power connector for ONTs.

Power classified the subject cables under subheading 8544.42.20, HTSUS, which covers insulated electric conductors, for a voltage not exceeding 1,000 volts, fitted with connectors, "of a kind used for telecommunications." This provision is a duty-free provision under column 1 of the HTSUS but subject to additional duties under Section 301 of the Trade Act of 1974 (Pub. L. 93–618, 19 U.S.C. § 2411) ("Section 301"). Between 2020 and 2021, U.S. Customs and Border Protection (CBP) liquidated the entries and classified the merchandise as entered under subheading 8544.42.20, HTSUS, with the assessment of Section 301 duties at a rate of either 10 percent or 25 percent *ad valorem*, depending on the date of entry.[5]

On September 11, 2020, Cyber Power filed Protest No. 3501-20-102183, challenging CBP's "[c]lassification of certain telecommunications cables under HTS subheading 8544.42.2000 and assessment of Section 301 retaliatory tariffs," claiming that "[t]he products are properly classified under HTS subheading 8544.42.2000/9903.88.33, and are exempt from Section 301 tariffs." *See* Protest and Entries from the Port of Minneapolis, MN, ECF No. 9-1 at 1 (July 9, 2021). Cyber Power claimed that its merchandise was eligible for an exclusion from Section 301 duties, under an exemption covering "[i]nsulated electric conductors for a voltage not exceeding 1,000V, fitted with connectors of a kind used for telecommunications, each valued over $0.35 but not over $2." *See* Subheading 9903.88.33, HTSUS; U.S. Note 20(ll)(62), Ch. 99, HTSUS. CBP denied the protest on November 4, 2020. ECF No. 9-1 at 1. In its denial, CBP

---

[5] On September 21, 2018, the USTR issued a third round of tariffs, referred to as List 3, which set the additional Section 301 duties at 10 percent beginning on September 24, 2018, with projected increases to 25 percent on January 1, 2019. *See* Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 47,974 (Sept. 21, 2018). The USTR eventually increased the rate of additional duties to 25 percent effective May 10, 2019. *See* Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 20,459 (May 9, 2019).

indicated that the correct classification for the cables presented is under subheading 8544.42.90, HTSUS.  *Id.* at 2.

On April 28, 2021, plaintiff commenced this action by filing a Summons challenging the denial of its protest.  *See* ECF No. 1.  On October 22, 2021, plaintiff filed its Complaint, and on December 21, 2021, the Government filed its Answer, asserting a Counterclaim against the Plaintiff and alleging that the subject merchandise is properly classified under subheading 8544.42.90, HTSUS, as indicated in the protest denial.  *See* ECF Nos. 11, 14.  In its Counterclaim, the Government asked the Court to order the reliquidation of the subject merchandise under the proper HTSUS subheading and duty rate, direct the payment of any interest provided by law, and grant further relief as may be just and appropriate.  *See* ECF No. 14 at 11.  Plaintiff subsequently filed a motion to dismiss the Counterclaim, which the Court granted.  *See* ECF Nos. 17, 35; *see also Cyber Power Systems (USA) Inc. v. United States*, 586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022).  In granting the motion, the Court redenominated the Government's Counterclaim as an affirmative defense.  *See* ECF No. 35; *Cyber Power*, 586 F. Supp. 3d at 1334.

## QUESTIONS PRESENTED

(1)      Whether the imported cables are correctly classified as insulated electric conductors, for a voltage not exceeding 1,000 volts, fitted with connectors, "of a kind used for telecommunications" of subheading 8544.42.20, HTSUS, or under subheading 8544.42.90, HTSUS, as insulated electric conductors, for a voltage not exceeding 1,000 volts, fitted with connectors, other than those of a kind used for telecommunications.

(2)      Whether the imported cables are covered by the exclusion from Section 301 duties in U.S. Note 20(ll)(61) to Chapter 99, Subchapter III, HTSUS.

## SUMMARY OF ARGUMENT

Under General Rule of Interpretation 1, Cyber Power's cables are insulated electrical conductors, for a voltage not exceeding 1,000 volts, fitted with connectors, "other" than those "of a kind used for telecommunications" of subheading 8544.42.90, HTSUS. Subheading 8544.42.20, which covers insulated electrical conductors used for telecommunications, does not describe Cyber Power's cables. The subject cables are not "of a kind used for telecommunications" because they are cables used to power a broadband service provider's devices called Optical Network Terminals (ONTs). Telecommunication cables are designed and used to transmit signals, such as voice, video, or data for the purpose of communicating information. By contrast, the subject cables are designed and used to carry an electrical charge that powers the ONTs, especially where there is disruption to the power source, such as with the home circuit or the electrical grid. Although some of the cables at issue also contain signal conductors, the conductors are designed solely to provide an alarm to the ONT concerning the status of the power transmission from the Cyber Power devices. In short, the subject cables principally function to provide power to the ONTs, not transmit telecommunication signals.

Plaintiff's primary argument in support of its classification is that its cables are sold exclusively to telecommunication companies and used to power a telecommunications device. But this alone does not render the subject cables "used for telecommunications." The tariff provision does not cover any type of cable so long at it is used *with* a telecommunication apparatus. Instead, the cables must be of a kind used *for* telecommunications. Cables for telecommunications, based on lexicographic sources and technical encyclopedias, are those that are used to transmit information. Under plaintiff's interpretation, however, any cable used with a telecommunication device would be classified under subheading 8544.42.20, including power

10

cables that are plugged directly into an outlet and carry only electrical power, simply based on the industry with which they are used. This result is contrary to the plain meaning of the HTSUS.

The subject cables are thus not of a kind used for telecommunications and are correctly classified under subheading 8544.42.20, HTSUS. Accordingly, we ask the Court to order reliquidation of the subject merchandise under this subheading and order Cyber Power to pay all additional duties, taxes, and fees determined to be due on reliquidation, with interest as provided for by law, including but not limited to interest pursuant to 19 U.S.C § 1505(d) and (c), and post-judgment interest.

## ARGUMENT

### I.    Legal Framework

#### A.    Legal Standard for Summary Judgment

On a motion for summary judgment, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex*, 477 U.S. at 322-23. The Court must view the evidence in the light most favorable to the non-movant and may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted); USCIT R. 56(a).

#### B.    Legal Standard for Classification

"The [C]ourt's review of a classification dispute involves two steps. First, it must determine the meaning of the relevant tariff provisions, which is a question of law." *RKW Klerks Inc. v. United States*, 592 F. Supp. 3d 1349, 1354 (Ct. Int'l Trade 2022), *aff'd*, 94 F.4th 1374

(Fed. Cir. 2024) (citing *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998)). "Second, it must determine whether the merchandise at issue falls within a particular tariff provision, as construed, which is a question of fact." *Id.* (citations omitted). When, as here, "no factual dispute exists regarding the merchandise, resolution of the classification turns solely on the first step," a "question of law" that the court determines *de novo*. *Id.* (citations omitted). That question of law is governed by the HTSUS's General Rules of Interpretation (GRIs). *Id.* at 1355.

The GRIs provide the analytical framework for the classification of goods under the HTSUS. *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011) (citing *N. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001)). A classification analysis begins with applying GRI 1, which requires that classification be "determined according to the terms of the headings and any relative section or chapter notes" as HTSUS chapter and section notes are considered binding statutory law. GRI 1; *Minnetonka Brands, Inc. v. United States*, 110 F. Supp. 2d 1020, 1025 (Ct. Int'l Trade 2000); *BenQ Am. Corp.*, 646 F.3d at 1376; *see also RKW*, 592 F. Supp. 3d at 1354–5 ("The HTSUS is designed so that most classification questions can be answered by GRI 1.") (citation omitted).

HTSUS terms generally are construed "according to their common commercial meanings." *Millennium Lumber Distribution Ltd. v. United States*, 558 F.3d 1326, 1329 (Fed. Cir. 2009). "Courts may rely upon their own understanding of terms or consult dictionaries, encyclopedias, scientific authorities, and other reliable information" in ascertaining common meaning. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citations omitted). This includes HTSUS provisions and U.S Notes under Chapter 99, which are enacted by Congress or proclaimed by the President. *See Keystone Auto. Operations, Inc. v. United*

*States*, 732 F. Supp. 3d 1339, 1346 (Ct. Int'l Trade 2024) (citing *Maple Leaf Mktg., Inc. v. United States*, 528 F. Supp. 3d 1365, 1370 (Ct. Int'l Trade 2021)). "Unless the context requires otherwise, the general notes and rules of interpretation, the section notes, and the notes in chapters 1 through 98 apply to the provisions of [Chapter 99]." U.S. Note 2, Ch. 99, HTSUS. Although the U.S. Notes to Chapter 99 may relate only to specific subheadings or statistical reporting numbers, the provisions in these notes are "persuasive as to what Congress intended" in "the context of the [HTSUS] as a whole." *See Sarne Handbags Corp. v. United States*, 100 F. Supp. 2d 1126, 1134–35 (Ct. Int'l Trade 2000); *see also Keystone Auto. Operations*, 732 F. Supp. 3d at 1346.

### C.    Heading 8544 and Note 20(ll)(61) to Chapter 99

At the time of the entry of the subject merchandise, the relevant HTSUS provisions at issue, subheadings 8544.42.20 and 8544.42.90, HTSUS, provided as follows:

| | |
|---|---|
| 8544 | Insulated (including enameled or anodized) wire, cable (including coaxial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors or fitted with connectors: |
| | Other electric conductors, for a voltage not exceeding 1,000 V: |
| 8544.42 | Fitted with connectors: |
| | Other: |
| 8544.42.20 | Of a kind used for telecommunications.........Free |
| 8544.42.90 | Other………………………………………….2.6% |

*See* Subheadings 8544.42.20 & 8544.42.90, HTSUS (2019). At the time of entry, both provisions were subject to additional duties pursuant to Section 301 of the Trade Act of 1974. For merchandise entered before May 10, 2019, the additional duty rate was 10 percent *ad valorem*; for those entered on or after May 10, 2019, the additional duty rate was 25 percent *ad*

*valorem*. *See* 83 Fed. Reg. 47,974; 84 Fed. Reg. 20,459. Merchandise subject to these additional

duties are secondarily classified under subheading 9903.88.03. *See* Subheading 9903.88.03,

HTSUS; *see also* 83 Fed. Reg. at 47,976.

However, at the time of entry, the additional Section 301 duties provided for in

subheading 9903.88.03 did not apply to the following merchandise classified under subheading

8544.42.20:

> Insulated electric conductors for a voltage not exceeding 1,000V,
> fitted with connectors of a kind used for telecommunications, each
> valued over $0.35 but not over $2 (described in statistical reporting
> number 8544.42.2000)

*See* Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology

Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 57,803 (Oct. 28, 2019); U.S. Note

20(ll)(61), Ch. 99, HTSUS; *see also* Subheading 9903.88.33, HTSUS, Ch. 99, HTSUS.

Merchandise is exempt from Section 301 duties under Note 20(ll)(61) if it satisfies the terms of

the product description in the note and is described in statistical reporting number (SRN)

8544.42.2000. But to be described in SRN 8544.42.2000, the merchandise must also be

correctly classified under the appropriate heading (8544) and subheading (8544.42.20), meaning

that the underlying primary classification must also be correct.[6] Thus, regardless of CBP's

classification upon liquidation, the Court must independently determine whether the merchandise

is correctly classified under subheading 8544.42.20, in addition to determining whether the

---

[6] There is no further statistical breakdown of subheading 8544.42.20, such that all
merchandise classified under subheading 8544.42.20 are described in statistical reporting number
8544.42.2000.

merchandise meets the product description in the exclusions.[7]  *See Jarvis Clark Co. v. United States*, 733 F.3d 873, 878 (Fed. Cir. 1984); *see also* Note 20(ll)(61), Ch. 99, HTSUS.

## II.    Cyber Power's Cables Are Power Cables And Therefore Not Classified in Subheading 8544.42.20 as Cables "of a Kind Used for Telecommunications"

Cyber Power's cables are power cables.  Therefore, pursuant to the applicable of GRI 1, they cannot be classified in subheading 8544.42.20.  To be classified under subheading 8544.42.20, the subject cables must be (i) insulated electric conductors, (ii) fitted with connectors, (iii) for a voltage not exceeding 1,000 volts, and (iv) of a kind used for telecommunications.  The merchandise at issue are cables composed of insulated electric conductors.  They are fitted with one of three types of connectors at each end of the cable.  Finally, the rated voltage for each cable is around 300 to 400 volts, which does not exceed 1,000 volts.  Thus, the issue is whether the cables are "of a kind used for telecommunications."

### A.  The Subject Cables Are Not of a Kind Used for Telecommunications

The term "of a kind used for" in subheading 8544.42.20 indicates that the provision identifies the article, at the eight-digit level, by its use.  *Primal Lite, Inc. v. United States*, 22 C.I.T. 697, 700 (1998), *aff'd*, 182 F.3d 1362 (Fed. Cir. 1999).[8]  Additional Rule of Interpretation

---

[7]  Both the exclusion's product description and the article description for subheading 8544.42.20 cover insulated electric conductors fitted with connectors, for a voltage not exceeding 1,000 volts, that are of a kind used for telecommunications.  Thus, other than the requirement that such conductors are "each valued over $0.35 but not over $2," the interpretative analysis for the product description in the exclusion and article description in subheading 8544.42.20 are the same.

[8]  Inclusion of the terms "of a kind" with "used for" in a tariff provision "is nothing more than a statement of the traditional standard for classifying importation by their use, namely, that it need not necessarily be the actual use of the importation but is the use of the kind of merchandise to which the importation belongs. . . . [Any] focus on the use of the 'kind' rather than the use of the specific importation does not broaden a 'use' classification to include a separate class of similar merchandise not used for the same purpose."  *Primal Lite, Inc.*, 22 C.I.T. at 700.  Moreover, the term "of a kind" simply "incorporates into the HTSUS language of

*(cont'd)*

(ARI) 1 "dictates how tariff classifications should be construed when the classification decision is controlled by use." *Primal Lite, Inc.*, 182 F.3d at 1363; *see also* ARI 1, HTSUS.  ARI 1(a) provides that, in "the absence of special language or context which otherwise requires, a tariff classification controlled by use (other than actual use) is to be determined in accordance with *the use* in the United States at, or immediately prior to, the date of importation, *of goods of that class or kind to which the imported goods belong*, and the controlling use is the principal use."  ARI 1(a), HTSUS (emphasis added).

ARI 1(a) identifies the classification mechanism for "principle use" provisions, which is to "classify merchandise according to the ordinary use of a particular class of merchandise in the United States."  *GRK Canada, Ltd. v. United States*, 180 F. Supp. 3d 1260, 1267 (Ct. Int'l Trade 2016), *aff'd*, 885 F.3d 1340 (Fed. Cir. 2018) (citing *Primal Lite*).  "The purpose of [such] 'principal use' provisions in the HTSUS is to classify particular merchandise according to the ordinary use of such merchandise, even though particular imported goods may be put to some atypical use."  *Primal Lite*, 182 F.3d at 1363; *see also Clarendon Mktg., Inc. v. United States,* 144 F.3d 1464, 1467 (Fed. Cir. 1998) (stating that such use provisions "may function as a controlling legal label, in the sense that even if a particular import is proven to be actually used inconsistently with its principal use, the import is nevertheless classified according to its principal use").

Under ARI 1(a), the Court must thus determine the "class or kind" of goods to which the subject merchandise belongs and does so by reference to "those goods that are commercially fungible with the imported goods."  *Primal Lite*, 182 F.3d at 1364.  "The so-called *Carborundum*

---

'use' classification the long-established principle that it is the use of the class or kind of goods being imported that is controlling, rather than the specific use to which the importation itself is put."  *Id.* at 698.

factors provide guidance in determining what goods are commercially fungible with the imported

goods." *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312–13 (Fed. Cir. 2012) (citing

*BenQ Am. Corp.*, 646 F.3d at 1377). These factors include: (i) use in the same manner as

merchandise which defines the class; (ii) the general physical characteristics of the merchandise;

(iii) the economic practicality of so using the import; (iv) the expectation of the ultimate

purchasers; (v) the channels of trade in which the merchandise moves; (vi) the environment of

the sale, such as accompanying accessories and the manner in which the merchandise is

advertised and displayed; and (vii) the recognition in the trade of this use. *See United States v.*

*Carborundum Co.,* 63 CCPA 98, 536 F.2d 373, 377 (1976).

The Court must then determine the principal use of that class of goods, which is the

controlling use, to determine whether that use is described by the tariff provision. *See* ARI 1(a).

The principal use is the use "which exceeds any other single use." *Lenox Collections v. United*

*States*, 20 C.I.T. 194, 196 (1996). Here, subheading 8544.42.20 describes the use of the

insulated electric conductors (with a voltage not exceeding 1,000 volts and fitted with

connectors) of such subheading as "for telecommunications."

### 1. Cables of a Kind Used for Telecommunications Function with the Purpose of Transmitting and Receiving Information

The term telecommunications (or telecom) in its basic form means "communication at a

distance." *See* telecommunications, Merriam-Webster Dictionary, https://www.merriam-

webster.com/dictionary/telecommunication (last accessed June 26, 2025). "Communication," in

turn, means the exchange of information. *See* communication, Merriam-Webster Dictionary,

https://www.merriam-webster.com/dictionary/communication (last accessed June 27, 2025).

Another lexicographic source specifies that "telecommunications" means "the sending and

receiving of messages by computer, telephone, radio, and television[.]" *See* telecommunications,

Cambridge Dictionary,

https://dictionary.cambridge.org/us/dictionary/english/telecommunications (last accessed June

27, 2025).

    Scientific and technical authorities define the term as the "practice of the transfer of

information by any electromagnetic means, such as wire or radiowaves."  Telecommunications,

Oxford: A Dictionary of Electronics and Electrical Engineering (5th ed. 2018), available at

https://www.oxfordreference.com/display/10.1093/acref/9780198725725.001.0001/acref-

9780198725725-e-4658 (last accessed June 27, 2025); *see also* telecommunications, Oxford: A

Dictionary of Physics (8th ed. 2019) ("The study and application of means of transmitting

information, either by wires or by electromagnetic radiation."), available at

https://www.oxfordreference.com/display/10.1093/acref/9780198821472.001.0001/acref-

9780198821472-e-3020 (last accessed June 27, 2025); telecommunications, Oxford: A

Dictionary of Media and Communications (3d ed. 2020) ("The technical systems enabling the

electronic transmission and reception of data or messages over a distance in analogue or digital

form via radio signals, wires, or fibre optic cables."), available at

https://www.oxfordreference.com/display/10.1093/acref/9780198841838.001.0001/acref-

9780198841838-e-2735 (last accessed June 27, 2025).

    Based on the above definitions, merchandise "for telecommunications" are those that are

for transmitting, receiving, or transferring information by electromagnetic means.   As applied to

subheading 8544.42.20, cables for telecommunications refer to insulated electric conductors, for

a voltage not exceeding 1,000, fitted with connectors, that function to transmit, receive, or

transfer information.

### 2. The Subject Cables Do Not Belong to a Class or Kind of Merchandise That Is Principally Used for Telecommunications.

As explained above, the "class or kind" of goods to which the imported cables belong are those that are commercially fungible with them. *Primal Lite*, 182 F.3d at 1364. An imported article is "fungible" with another where it is "[c]ommercially interchangeable" based on having "propert[ies] of the same kind." Fungible, Black's Law Dictionary (11th ed. 2019).

The class of goods that the imported cables belong are power cables for electrical appliances. Based on the fitted connectors, these cables are more specifically power cables that are designed to transfer electrical current from a battery backup device to a service provider's optical network terminal. Similar cables, including those from competitors identified by plaintiff, discussed further below, all function in the same manner. They are all designed to power an optical network terminal from a battery backup. Thus, these cables are commercially fungible with other power cables that power ONTs. The function and purpose of such cables is to provide power to the ONT. Such cables are not used to facilitate the transfer of voice, images or similar data.

A review of the *Carborundum* factors demonstrates that the subject cables are commercially fungible with cables that are primarily used to power devices.

### a. *The Use in a Manner That Defines the Class (Actual Use)*

The first factor, "the use in the manner that defines the class" (referred to as the actual use) strongly indicates that the subject cables are commercially fungible with similar cables that deliver power, not telecommunications. The subject cable's actual use, particularly in this instance, is the most probative evidence of its principal use. *See Aromont*, 671 F.3d at 1313 ("Actual use . . . is . . . perhaps one of the more important of the *Carborundum* factors."). The cables at issue are used to connect two electronic devices—the battery backup device and the

ONT—and form part of the power transmission path from the main power source (the utility power supply), through the backup device, to the ONT. *See* Gov't SOF ¶¶ 1, 5–8 (Fuehrer Dep. 26:23-27:21, 34:11-35:13). When this cable is connected to the ONT, it is the ONT's only source of power. *See* Gov't SOF ¶ 8 (Fuehrer Dep. 34:14-35-21). Without it, the device would not turn on. *See* Gov't SOF ¶ 7 (Fuehrer Dep. 176:18-23). Although the 7PIN cables also transmit signals through certain wires, discussed further below, the subject cables as a whole are actually used for power transmission.

<em>b.</em>  <u><em>The General Physical Characteristics of the Merchandise</em></u>

The second factor, the "general physical characteristics of the merchandise," also favors the conclusion that the subject cables are used for power transmission purposes. The cables contain wires to transmit power and are fitted with connectors that are "standard connection[s] for [] power cables." Gov't SOF ¶ 10 (Fuehrer Dep. 33:11-12), ¶ 11 (Fuehrer Dep. 108:1-10).

The BRL cable is undisputedly a power cable that is designed as such. *See* Pl.'s SOF ¶ 8. It contains only wires that carry the voltage required to power the ONT and contains no signal wires. Gov't SOF ¶ 24 (Fuehrer Dep. 65:8-17). It does not transmit information, including voice, images, video, or data of any kind. *Id.*; Pl.'s SOF ¶ 8. Likewise, the BUL cable contains wires for power transmission. Gov't SOF ¶ 19 (Pl.'s SOF Ex. B, C). Although the BUL cable contains one signal wire, it is designed to connect the ONT to a "power adapter," which is essentially a power supply that converts AC voltage to DC voltage. *See* Fuehrer Dep. 121:8-14; *see also* power adapter, PCMag.com, https://www.pcmag.com/encyclopedia/term/power-adapter (last accessed June 27, 2025); *see, e.g.*, Universal Power Adapters, Cyber Power, https://www.cyberpowersystems.com/products/accessories/universal-power-adapters (last accessed June 27, 2025). The 7PIN cable is similarly designed for use as a power cable, with

20

wiring that provides power to the ONT.  Although it contains five signal wires, the data transmitted through the other smaller wires in the 7PIN cables are incidental to the main power conductors within the cables.  The data transmitted is limited to information regarding whether the battery backup device's battery is on, is low, needs to be replaced, or is missing.  Gov't SOF ¶¶ 30–34 (Gov't Ex. A Response 5).  These signal wires are described as only providing "alarm conditions" to the ONT relating to the power distribution of the devices.  *See* CSN27U12V, Cyber Power, https://www.cyberpowersystems.com/product/telecom/indoor/csn27u12v (last accessed June 27, 2025); *see also* Conf. Gov't Ex. E.  The function of the 7PIN cables, like the BRL and BUL cables, is to provide continuous power to the ONT from a battery in the Cyber Power device.  As part of that function, the 7PIN cables also contain wiring that provide signals regarding the status of the battery.  But the 7PIN cables principally power the ONT and secondarily provide signals concerning that very same power transmission.  Without the power transmission from the battery in the backup device, there would be no need for those other signals related to the status of the battery.  Therefore, that the 7PIN cables contain these signal wires does not render them commercially fungible with cables for telecommunications.[9]

### c.   *The Economic Practicality of So Using the Import*

The third factor is the "economic practicality of so using the import."  There is no evidence that it would be economically practical to use the subject cable for anything other than

---

[9] Cables cannot be "of a kind for telecommunications" merely because they have signal wires.  For example, cables that are "for use in connecting patients to monitoring devices"—which undoubtedly contain signal wires—are purportedly classified under subheading 8544.42.90, HTSUS.  *See* U.S. Note 20(vvv)(iii)(61), Ch. 99, HTSUS.  Similarly, a cable that connects a trailer to a vehicle contains both power wires and signal wires.  *See, e.g.*, Trailer Wiring Diagram, e-trailer.com, https://www.etrailer.com/faq-wiring.aspx# (last accessed June 27, 2025).  Thus, not all insulated conductors that transmit a signal are classified as telecommunications cables.  Instead, as indicated above, cables of a kind for telecommunications are those that are principally used to transmit information.

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

to power an ONT from a battery backup device.  In fact, Cyber Power testified that cables with the specific connectors included in the subject cables (the 9-pin, 7-pin, and barrel connectors) do not have any other known use than to connect an ONT and a battery backup unit.  Gov't SOF ¶ 42 (Fuehrer Dep. 109:5-23).  This is because the cables are "very specifically designed" and used for "specific pieces of equipment."  Gov't SOF ¶ 41 (Fuehrer Dep. 109:19-23).  Thus, it would be impractical to use the subject cables for anything other than powering an ONT from a battery backup device.

> d.  *The Expectations of the Ultimate Customers*

The fourth factor, "the expectations of the ultimate customers," further indicates that the subject cables are of a class or kind of merchandise used to power devices.  The ultimate customers of the subject cables are internet service providers, such as Verizon.  Gov't SOF ¶¶ 3, 10, 43 (Fuehrer Dep. 17:4-11, 33:1-10, 158:23-159:16).  These service provider's ONTs contain a standard connection (socket) for the power cables that connect to their device.  Gov't SOF ¶¶ 10, 11 (Fuehrer Dep. 33:11-17, 108:1-10).  When a service provider uses a battery backup system for their installation, the battery backup system's cable, such as the cables at issue, plug into the same connection.  Gov't SOF ¶¶ 8, 10, 11, 43 (Fuehrer Dep. 33:11-17, 35:14-21, 108:1-15, 159:13-16).  In this specific instance, Verizon provided required specifications for the BUL and 7PIN cables in a Request For Proposal for cables fitting its ONTs.  *See* Gov't Exs. D, E.  The Request For Proposal sought a ██████████████ ]] and its requirements described the cables with the moniker [[█████]].  *See* Gov't Ex. E at 00445, 00446.  The ultimate customers—the services providers—thus purchase, and expect, the subject cables to power their device, not for telecommunications through their network.

e.  *The Channels of Trade in Which the Merchandise Moves*

The fifth factor, "the channels of trade in which the merchandise moves," further supports classifying the merchandise as a power cable.  Because the subject cables are sold specifically to service providers for use with a particular battery backup device and ONT, they are not typically sold for retail sale and have limited channels of trade.  *See* Gov't SOF ¶¶ 41, 42 (Fuehrer Dep. 109:19-23); Pl.'s SOF ¶ 18.  Nevertheless, competing products, discussed below, are similarly sold directly to service providers for use as power cable that connects the ONT to a battery backup device.

f.  *The Environment of Sale*

The sixth factor looks to accompanying accessories and the manner in which the merchandise is advertised and displayed.  The subject cables are imported and sold with Cyber Power's battery backup devices, which are necessary for the battery backup devices to connect to the ONTs.  Gov't SOF ¶ 4 (Fuehrer Dep. 23:21-24:3).  Before the sale of these cables, the service provider, such as Verizon, provides the required specifications.  Gov't SOF ¶¶ 43, 44 (Fuehrer Dep. 158:23-160:6; Gov't Ex. B at Response 1).  As indicated above, for the BUL and 7PIN cables, the request for proposal described the product as a power cable.  Gov't SOF ¶ 45 (Conf. Gov't Ex. E).  As understood in the procurement process, therefore, the subject cables were understood to be cables for the purpose of providing power.  Cyber Power Nevertheless marketed the subject cables as "telecom" cables in its online catalog.  *See* Pl.'s SOF ¶ 19 (P.'s SOF Ex. C).  But the reference to "telecom" indicates that it is used in the telecommunications industry because it plugs into an ONT.  It does not indicate that the cables are actually used to telecommunicate.

23

g.   _The Recognition in the Trade of the Use_

The last factor, "the recognition in the trade of such use," also suggests a use for these cables as power cables, not telecommunication cables.  Under this factor, "courts consider whether the merchandise is recognized in the trade as having that particular use or whether it meets certain specifications recognized in the trade for that particular class of products." _Aromont_, 671 F.3d at 1316.  The subject cables are recognized in the trade both as having the specific use of powering the ONTs and meeting the specifications recognized for such power cables.  As discussed above, service providers recognize the use of these cables as powering their devices.  In addition, Cyber Power identified PowerTec Solutions International as a company that sells products that compete with the subject cables.  _See_ Pl. Br. at 18.  Like Cyber Power, PowerTec similarly produces battery backup units and associated cables for use with ONTs.  _See_ PS7PCDIN Series, PowerTec Solutions International, https://www.powertecsolutions.net/solutions/ps7pcdin-series-calix-716-i-and-836ge-telemetry-cable/ (last accessed June 27, 2025); _see also_ ADTRAN 602x/621i/622, Precision Group, https://goprecisiongroup.com/product/adtran-602x-621i-622-other-cable-assembly-pp7p5521-x (last accessed June 27, 2025).  These cables have similar specifications to the subject cables, and are similarly used to power ONTs from battery backup systems.  Like the subject cables, they contain the same connectors, which are standard connectors used by service providers for powering their ONTs.  Gov't SOF ¶ 11 (Fuehrer Dep. 108:1-15).  Even Cyber Power's own website states that its battery backup devices "suppl[y] continuous power to . . . optical network terminals."  CSN27U12V, Cyber Power, https://www.cyberpowersystems.com/product/telecom/indoor/csn27u12v (last accessed June 27,

2025).  Thus, even within the telecommunications industry, these cables are all recognized as providing power to ONTs.

* * *

In sum, the imported cables are commercially fungible with other cables used to connect ONTs to a battery backup device.  The principle use of such cables is to power the internet service provider devices, and not transfer information in the form of voice, video, or data.  Cyber Power procures and sells cables that are designed specifically to the specifications of the service provider's ONT, which, in this case, issued specifications calling for a power cable.  The cables also connect to Cyber Power's battery backup device, which provides continuous power to the ONT.  Cyber Power's competitors sell similar cables, which are likewise used with a competitor's battery backup unit and a service provider's ONT.  Accordingly, the subject cables are of a kind used for power delivery, not telecommunications.

### B.  Plaintiff Misinterprets the Phrase "Used for Telecommunications"

In its motion for summary judgment, plaintiff avoids the fact that its cables are principally designed and function to provide power between its devices and the ONTs.  *See* Pl.'s Motion for Summary Judgment ("Pl.'s Br.") at 13–18.  Instead, Cyber Power argues that its merchandise belongs to class of goods consisting of "telecommunication cables" because it is used with telecommunications equipment.  Cyber Power's arguments fall short because it misreads the tariff provision.

Plaintiff misinterprets "for telecommunications" to mean related to a telecommunications device.  But the heading covers conductors used *for* telecommunications, not conductors used *in* telecommunications.  *See* Pl.'s Br. at 13 (stating that "the provision at issue covers 'use in telecommunications'"); Pl.'s Br. at 14 (same).  The use of the preposition "for" in the phrase

"used for" indicates that the purpose, function, or reason for the cable is to telecommunicate. *See, e.g.*, for, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/for (last accessed June 27, 2025) ("a. used as a function word to indicate purpose"); for, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/for ("having the purpose of").  It does not mean connected with a particular subject.  *See* in, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/in ("involved or connected with a particular subject or activity").

Thus, the industry in which these cables are used is not determinative of the classification.[10]  If that were the case, many generic power cables—those that plug into an outlet and contain only power wires—would be classified as "telecommunications" cables merely because they are sold to a telecom company, while the same cable could also be sold to power other devices in another industry.  Instead, it is the cable's function and purpose that controls the determination of whether it is for telecommunications.  Here, the function of the class or kind to which the subject cable belongs is to provide power from the battery backup systems to the ONT.  Further, had the drafters of the HTSUS intended for the subheading to cover cables used with a telecommunications device, they would have expressly stated that intention.  *See, e.g.*, subheading 8504.40.85, HTSUS (covering certain static converters "for telecommunication apparatus"); subheading 8504.50.40 (covering certain inductors "for telecommunication apparatus"); *see also* U.S. Note 20(ss)(35), Ch. 99, HTSUS (covering "[p]ower supplies for fiber

---

[10]  Even if the provision referred to cables used *in* telecommunications, the cables at issue are not "involved in" or "connected with" the "particular activity" of telecommunications, in that they merely provide power to devices involved in telecommunications and, for some, incidental signals regarding the power transmission to those devices.

optic communications *equipment*, that convert 120-240 V AC to 12 V DC[.] . . . (described in statistical reporting number 8504.40.8500)) (emphasis added).

Moreover, Cyber Power's *Carborundum* seven-factor analysis does not support classification under subheading 8544.42.20. Plaintiff's analysis as to these factors rests on the faulty premise that its cables only need to be used by telecom service providers to be of a kind used for telecommunications. *See* Pl.'s Br. at 14–18. For example, as to the use in the same manner that defines the class (factor 1), plaintiff argues that its cables connect telecommunication devices and are described by Cyber Power as telecom cables. But plaintiff provides no information as to how the subject cables are actually used for transmitting telecommunications data, a requirement for the class or kind of cables used for telecommunications. It appears these merely provide power to telecom devices. Such service providers use different cables to actually provide the telecommunications network, such as fiber optic cables, ethernet cables, coaxial cables, etc. Plaintiff's discussion of the economic practicality of so using the import (factor 3), the expectations of the ultimate purchasers (factor 4), the environment of the sale (factor 6), and the recognition in the trade (factor 7) all similarly rests of the fact that these cables are either used *with* a telecommunication device (and ONT) or *by* telecom companies. That alone does not render them cables *for* telecommunications.

Further, plaintiff's description of the general physical characteristics of the cables (factor 2) equally apply to cables that are not of a kind for telecommunications, such as power cables, and does not weigh in plaintiff's favor. Finally, its discussion of the channels of trade in which the subject cable moves (factor 5) is inapposite. That these cables are not largely sold for retail sale has no bearing on whether they are of a kind for telecommunications. Many telecommunications cables *are* sold in a retail setting, such as Ethernet cables and the like. As

27

indicated above, the *Carborundum* factors do not support classification of the subject cables under subheading 8544.42.20, HTSUS.

Accordingly, Cyber Power's merchandise is not of a kind used for telecommunications of subheading 8544.42.90.

### C. The Subject Cables Are Other Than Those of a Kind Used for Telecommunications

Because the subject cables are not of a kind used for telecommunications, they fall under the category for "other" electrical conductors fitted with connectors for a voltage not exceeding 100 volts. Under subheading 8544.42, there are two categories of electric conductors, for a voltage not exceeding 1,000 volts, that are fitted with connectors (other than modular telephone connectors): (1) those that are "of a kind used for telecommunications" and (2) "other." *See* Subheading 8544.42.20 & 8544.42.90, HTSUS. As discussed above, the subject cables are of a kind used to deliver power to an electrical appliance or device, *i.e.*, the ONT, and not of a kind used for telecommunications. Accordingly, the subject cables are classified as "other" cables of subheading 8544.42.20.

### III. Cyber Power's Cables Do Not Meet the Terms of Note 20(ll)(61) Because they Are Not Classified in Subheading 8544.42.90

The product description in the exclusion under Note 20(ll)(61) provides for "[i]nsulated electric conductors for a voltage not exceeding 1,000 V, fitted with connectors of a kind used for telecommunications, each valued over \$0.35 but not over \$2 (described in statistical reporting number 8544.42.2000)." *See* Note 20(ll)(61), Ch. 99, HTSUS. As explained above, to meet the exclusion from Section 301 duties, the merchandise must be described by statistical reporting number 8544.42.2000 and thus classified under subheading 8544.42.20. Because the merchandise is properly classified under subheading 8544.42.90, the cables do not meet the terms of the exclusion in Note 20(ll)(61).

Moreover, as plaintiff concedes, *see* Pl.'s Br. 20, even if the cables are classified in subheading 8544.42.90, HTSUS, and are thus "insulated electric conductors for a voltage not exceeding 1,000 [volts], fitted with connectors of a kind used for telecommunications" they are not all "each valued over $0.35 but not over $2." *See* Note 20(ll)(61), Ch. 99, HTSUS. Based on the entry paperwork, the subject cables were valued between $1.30 and $3.05. *See* Gov't SOF ¶ 46. The following is a summary of the unit prices for each of the subject cables at issue in this action:

| Entry No. | Model | Price Per Unit ($) | Invoice ECF 9-1 Page No. |
|---|---|---|---|
| 791-1911526-4 | CBL2BUL-004-BLK-CM | 1.65 | 58 |
| 791-1912644-4 | CBL7PIN350BRL-003-BLK | 2 | 79 |
| | CBL7PINBUL-002-BLK-CM | 1.4 | 79 |
| | CBL2BUL-004-BLK-CM | 1.65 | 79 |
| 791-1913004-0 | CBL2BUL-004-BLK-CM | 1.65 | 94 |
| | CBL7PINBUL-004-CM | 1.9 | 94 |
| | CBL7PINBUL-010-CM | 3.05 | 94 |
| | CBL7PINBUL-006-BLK-CM | 2.3 | 94 |
| | CBL7PINBUL-006-CM | 2.3 | 94 |
| 791-1914266-4 | CBL7PIN350BRL-003-BLK | 2 | 110 |
| | CBL7PINBUL-006-CM | 2.3 | 110 |
| | CBL7PINBUL-004-CM | 1.9 | 110 |
| 791-2441260-7 | CBL7PINBUL-004-CM | 1.7 | 121 |
| | CBL7PINBUL-006-CM | 2 | 121 |
| | CBL7PINBUL-010-CM | 2.7 | 121 |
| | CBL7PIN350BRL-003-BLK | 1.7 | 121 |
| 791-2444274-5 | CBL7PINBUL-002-BLK-CM | 1.3 | 134 |
| | CBL7PINBUL-006-BLK-CM | 2 | 134 |
| 791-2448288-1 | CBL7PINBUL-002-BLK-CM | 1.4 | 142 |
| 791-2448381-4 | CBL7PINBUL-004-CM | 1.9 | 158 |
| | CBL7PINBUL-006-CM | 2.3 | 158 |
| 791-2455652-8 | CBL7PINBUL-004-CM | 1.62 | 172 |
| | CBL7PINBUL-010-CM | 2.59 | 172 |
| 791-2457242-6 | CBL7PINBUL-004-CM | 1.62 | 193 |
| | CBL7PINBUL-006-CM | 1.96 | 193 |
| | CBL7PINBUL-010-CM | 2.59 | 193 |
| | CBL7PINBUL-002-BLK-CM | 1.19 | 193 |
| | CBL7PINBUL-006-BLK-CM | 1.96 | 193 |

*See* Protests and Entries from the Port of Minneapolis, MN, ECF No. 9-1 at 58, 79, 94, 110, 121, 134, 142, 158, 172, 193 (July 9, 2021).  The cables valued at over $2.00 a unit are not covered by the exclusion in Note 20(ll)(61) to Chapter 99, HTSUS even if they otherwise meet the terms of the exclusion.

**IV.    This Court Should Order the Reliquidation of the Subject Cables under Subheading 8544.42.90 and Order Cyber Power To Pay All Additional Duties**

As we have shown above, the subject cables are properly classified under subheadings 8544.42.90 and 9903.88.03, HTSUS.  These provisions carries a higher duty rate than the provisions under which the merchandise was liquidated.  Accordingly, as relief, we ask the Court to order reliquidation of the subject merchandise under subheadings 8544.42.90/9903.88.03, at a duty rate of 2.6 percent *ad valorem* and subject to Section 301 duties; and order Cyber Power to pay all additional duties, taxes, and fees determined to be due on reliquidation, with interest as provided for by law, including but not limited to interest pursuant to 19 U.S.C. § 1505(b) and (c), and post-judgment interest.

Relief in the form of reliquidation of the subject entries is appropriate here.  As the Court has previously explained, pursuant to the legal framework of *Jarvis Clark* and Section 2643(b), this Court "must 'reach the correct decision' in any civil action."  *Cyber Power*, 586 F. Supp. 3d at 1332 n.13 (citing 28 § 2643(b)); *Jarvis Clark, Inc. v. United States*, 733 F.2d 873, 877–78 (Fed. Cir. 1984).  Section 2643(a)(1) permits this Court to "enter a money judgment … *for or against* the United States in *any* civil action commenced under section 1581" (emphasis added) and Section 2643(c)(1) empowers this Court to "order any other form of relief that is appropriate in a civil action," including "orders of remand" and "injunctions."  28 U.S.C. § 2643.

Ordering Customs to reliquidate Cyber Power's entries to effect the "correct decision," 28 U.S.C. § 2643(b), and for Cyber Power to pay the additional duties, comfortably fits within these provisions. *See Second Nature Designs Ltd. v. United States*, 654 F. Supp. 3d 1301, 1307 n.6 (Ct. Int'l Trade 2023) (stating that an importer "may be liable to the Government for increased duties" if the Court concludes "that the appropriate classification carries a duty at a rate higher than that initially assessed by Customs"); *id.* ("'[T]he right of the United States to recover duties owed as a result of the Court's obligation to reach the correct result [is] a right addressed by *Jarvis Clark*'") (*quoting Cyber Power*, 586 F. Supp. 3d at 1332 n.13, 1334).

## CONCLUSION

For these reasons, the Court should grant the Government's cross-motion for summary judgment, deny Cyber Power's motion for summary judgment, enter judgment in the Government's favor, order the reclassification of the subject cables and for Cyber Power to pay all additional duties, and dismiss this action.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td>BRETT A. SHUMATE<br>Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td>By:</td><td>/s/ Justin R. Miller<br>JUSTIN R. MILLER<br>Attorney-In-Charge<br>International Trade Field Office</td></tr>
</table>

*Of Counsel:*

VALERIE SORENSEN-CLARK
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

June 27, 2025

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484
*Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. CLAIRE R. KELLY, JUDGE

_____

|  |  |
|---|---|
| CYBER POWER SYSTEMS (USA) INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Court No. 21-00200 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

_____

## CERTIFICATE OF COMPLIANCE

I, MATHIAS RABINOVITCH, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing brief in support of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 9,265 words.

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH