Slip Op. 26-41

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **CYBER POWER SYSTEMS (USA) INC.,** | |
| **Plaintiff,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Court No. 21-00200** |
| **UNITED STATES,** | |
| **Defendant.** | |

## OPINION AND ORDER

[Granting in part and denying in part Plaintiff's motion for summary judgment and granting in part and denying in part Defendant's cross-motion for summary judgment.]

Dated: April 23, 2026

John M. Peterson, Patrick B. Klein, Sanzida Talukdar and Richard F. O'Neill, Neville Peterson, LLP, of New York, N.Y. for Plaintiff Cyber Power Systems (USA) Inc.

Mathias Rabinovitch, Trial Attorney and Beverly A. Farrell, Senior Trial Attorney, International Trade Field Office, U.S. Department of Justice, of Washington, D.C. for Defendant United States.  On the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Justin R. Miller, Attorney-in-Charge, International Trade Field Office.  Of counsel was Valerie Sorensen-Clark, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of Washington, D.C.

Kelly, Judge:  Before the Court are cross-motions for summary judgment.  Pl.'s Mot. for Summ. J., Mar. 28, 2025, ECF Nos. 57, 58 ("Pl. Mot."); Def. Cross Mot. for Summ. J., Jun. 27, 2025, ECF Nos. 61, 62 ("Def. Mot.").  Plaintiff Cyber Power Systems (USA) Inc. ("Cyber Power") is the importer of record of the ten entries at issue in this action covering eight models of cables, entered at the Port of Minneapolis,

Court No. 21-00200                                                Page 2

Minnesota in 2019, which Customs and Border Protection ("CBP" or "Customs") classified under subheading 8544.42.20, Harmonized Tariff Schedule of the United States ("HTSUS"),[1] a duty-free provision. Complaint at ¶ ¶ 3, 13, Oct. 22, 2021, ECF No. 11 ("Compl."); Pl. Statement of Material Facts Not In Dispute at ¶ 1, Mar. 28, 2025, ECF No. 57-1 ("Pl. Facts"); Def.'s Resp. to Pl.'s Statement of Material Facts Not In Dispute at ¶ 1, June 27, 2025, ECF No. 61-1 ("Def. Resp. Pl. Facts"). In addition to classifying the goods under subheading 8544.42.20, HTSUS, CBP also classified them under subheading 9903.88.03, HTSUS, which imposes a 10 percent ad valorem duty for goods entered before May 10, 2019, and a 25 percent ad valorem duty for goods entered after May 10, 2019, according to Section 301 of the Trade Act of 1974 ("Section 301"). Compl. at ¶ 8, 10, 13; Protest and Entries from the Port of Minneapolis, Minnesota, Jul. 9, 2021, ECF No. 9-1 ("Protest"). Cyber Power protested the classification of its merchandise under subheading 9903.88.03, HTSUS, and the imposition of the additional Section 301 duties, claiming that the merchandise should have been classified under subheadings 9903.88.56 and 9903.88.33, HTSUS,[2] and

---

[1] All citations to the Harmonized Tariff Schedule of the United States ("HTSUS") refer to the 2019 edition, as determined by the date of importation of the last entry of the merchandise. See LeMans Corp. v. United States, 660 F.3d 1311, 1314 n.2 (Fed. Cir. 2011).

[2] Cyber Power argues that the goods are exempt under subheading 9903.88.33, HTSUS for goods liquidated prior to August 7, 2020, and under subheading 9903.88.56, HTSUS for goods liquidated after August 7, 2020, because the exemption was re-designated on August 7, 2020. Pl. Mot. at 1–2. The liquidation date of the

(footnote continued)

Court No. 21-00200                                                                     Page 3

thus excluded from Section 301 duties.[3]  See generally Protest.  CBP denied Cyber

Power's protest, and on April 28, 2021, Cyber Power commenced this action by filing

a summons challenging CBP's denial of its protest.  See Summons, Apr. 28, 2021,

ECF No. 1 ("Summons").  Defendant filed a counterclaim to reclassify the goods under

subheading 8544.42.90, HTSUS and recover the applicable 2.6 percent ad valorem

duty.  See Answer and Counterclaim of Defendant United States at 8, Dec. 21, 2021,

ECF No. 14 ("Answer").  Plaintiff moved to dismiss the government's counterclaim,

and this Court redenominated the counterclaim as a defense under USCIT R.

(8)(d)(2), holding that the United States lacked statutory authority to assert a

counterclaim in this case.  See Cyber Power Sys. (USA) Inc. v. United States, 586 F.

Supp. 3d 1325 (Ct. Int'l Trade 2022) ("Cyber Power I").

Cyber Power moves for summary judgment, contending that CBP improperly

assessed Section 301 duties pursuant to subheading 9903.88.03, HTSUS.  See Pl.

Mot. at 1.  CBP cross-moves for summary judgment, claiming not only that the goods

are subject to 10 percent or 25 percent ad valorem duties imposed by Section 301

subheading 9903.88.03, HTSUS, but that they are also properly classified under

---

goods is irrelevant to classification, which is determined by the date of importation of
the last entry.  LeMans Corp. v. United States, 660 F.3d 1311, 1314 n.2 (Fed. Cir.
2011) (classification is determined by date of entry).  The last entry at issue here
occurred in September 2019, and therefore, the Court looks only to the relevant
exemption CBP argues under subheading 9903.88.33, HTSUS.  See Summons at 3
(entries dated Apr. 4, 2019–Sept. 12, 2019).

[3]  Cyber Power did not challenge CBP's classification of the cables under HTSUS
subheading 8544.42.20.  See Protest at 10.

Court No. 21-00200                                                          Page 4

8544.42.90, HTSUS, and therefore subject to an additional 2.6 percent ad valorem duty.  See Def. Mot. at 1.  Cyber Power responds that even if the cables are properly classified under subheading 8544.42.90, HTSUS, the government should not be entitled to collect the additional 2.6 percent duties normally imposed by subheading 8544.42.90, HTSUS.  Pl. Resp. to Def. Mot. for Summ. J. at 11–15, Aug. 1, 2025, ECF No. 64 ("Pl. Resp.").  For the reasons that follow, Plaintiff's motion for summary judgment is granted in part and denied in part, and Defendant's cross-motion for summary judgment is granted in part and denied in part.  The cables are properly classified under subheading 8544.42.90, HTSUS, and subheading 9903.88.03, HTSUS, however, the government is not entitled to collect any additional duties which would normally be due under subheading 8544.42.90, HTSUS.

## UNDISPUTED FACTS

Cyber Power is the importer of record for the ten entries at issue consisting of eight models of cables (collectively, the "cables") entered through the Port of Minneapolis, Minnesota between April 2019 and September 2019.[4]  Compl. at ¶ 3; Answer at ¶ 3.  At the time of liquidation, between March 2020 and August 2020, CBP classified the entries under subheading 8544.42.20, HTSUS, and subheading 9903.88.03, HTSUS.  Summons at 3; Pl. Facts at ¶ 1; Def. Resp. Pl. Facts at ¶ 1; Pl. Mot. at 1; Def. Mot at 7–8.

---

[4] The relevant entries are 791-19115264, 791-19126444, 791-19130040, 791-142664, 791-24412607, 791-24442745, 791-24483814, 791-24482881, 791-24572426, 791-24556528.  Compl. at ¶ 6; Answer at ¶ 3.

Court No. 21-00200                                                    Page 5

The cables consist of eight models that fall into three groups:[5] (1) CBL2BUL

("2BUL") cables,[6] (2) CBL7PIN350BRL ("BRL") cables,[7] and (3) CBL7PINBUL

("7PIN") cables.[8] Pl. Mot. at 5–6; Def. Mot. at 5–7; see also Def. Statement of Material

Facts Not In Dispute at ¶¶ 18–29, Jun. 27, 2025, ECF Nos. 61-2; 62-2 ("Def. Facts");

Pl. Resp. to Def. Statement of Material Facts Not In Dispute at ¶¶ 18–29, Aug. 1,

2025, ECF No. 64-1 ("Pl. Resp. Def. Facts"). All subject cables are designed to connect

an uninterruptible power supply ("UPS") or battery backup unit ("BBU") to an optical

network terminal ("ONT") in a residential or commercial setting.[9] Pl. Facts at ¶¶ 10,

11, 12; Def. Resp. Pl. Facts at ¶¶ 10, 11, 12; Pl. Mot. at 3; Def. Mot. at 2. Because an

---

[5] Despite an initial dispute over the number of models of subject cables in this action, the parties conferred and agreed in their response to the Court's oral argument question that there are eight models at issue. Joint Response to Court Order at 3, Feb. 22, 2026, ECF No. 81; see Compl. at ¶¶ 6, 12, 17 (Cyber Power asserting there are seven cables at issue); Pl. Facts at ¶ 2; Pl. Resp. to Def. Facts at ¶ 13 (Cyber Power asserting there are eight cable models at issue, including CBL7PINBUL-004-BLK-CM, citing its protest of CBP's classification); Def. Resp. to Pl. Facts at ¶ 2; Def. Facts at ¶ 13 (CBP arguing that there are only seven models of cable in the relevant entries); Pl. Resp. at 1 ("[a]ll seven of the cables at issue . . .").

[6] The BUL cable model number at issue is CBL2BUL-004-BLK-CM. Pl. Facts at ¶ 2; Def. Facts at ¶ 13.

[7] The BRL cable model number at issue is CBL7PIN350BRL-003-BLK. Pl. Facts at ¶ 2; Def. Facts at ¶ 13.

[8] The 7PIN cables model numbers at issue are: CBL7PINBUL-010-CM, CBL7PINBUL-002-BLK-CM, CBL7PINBUL-004-BLK-CM, CBL7PINBUL-004-CM, CBL7PINBUL-006-CM, and CBL7PINBUL-006-BLK-CM. Pl. Facts at ¶ 2; Def. Facts at ¶ 13; Joint Response to Court Order at 3, Feb. 22, 2026, ECF No. 81.

[9] An ONT, as described by Plaintiff, "converts fiber network signals from light into copper and electric (Ethernet wiring) for your router to use. See Pl. Mot. at 3, n.2. The [optical network terminal] communicates with your provider's fiber network . . . your [optical network terminal] will require electricity to provide your fiber services." Pl. Mot. at 3, n.2.

ONT requires electrical power to operate, the UPS or BBU, when connected to the ONT by these cables, maintains the terminal's operation during power outages or disruptions. Pl. Facts at ¶¶ 10, 11, 12; Def. Resp. Pl. Facts at ¶¶ 10, 11, 12; Pl. Mot. at 3; Def. Mot. at 2.

Each of the eight models contains multiple copper conductors that carry electrical energy or electromagnetic signals. Pl. Facts at ¶ 4(a); Def. Resp. Pl. Facts at ¶ 4(a); Pl. Mot. at 5; Def. Mot. at 3. The conductors are insulated with polyvinyl chloride ("PVC") and enclosed within a PVC outer jacket. Pl. Facts at ¶ 4(c); Def. Resp. Pl. Facts at ¶ 4(c); Pl. Mot. at 5; Def. Mot. at 3. Each cable is designed to operate at the same voltage range as the UPS or BBU, which typically carry 120 volts ("V") of alternating current. Pl. Facts at ¶¶ 16,17; Def. Resp. Pl. Facts at ¶¶ 16,17; Pl. Mot. at 5; Def. Mot. at 3. Each cable operates at less than 1,000V by design. Pl. Facts at ¶¶ 16, 17; Def. Resp. Pl. Facts at ¶¶ 16, 17; Pl. Mot. at 5; Def. Mot. at 3.

The 2BUL cables are four feet long and contain three bare copper conductors. Def. Facts at ¶¶ 18–19; Pl. Resp. Def. Facts at ¶¶ 18–19. Two thicker conductors transmit power to the ONT, and one thinner conductor carries a signal to the ONT. Def. Facts at ¶ 19; Pl. Resp. Def. Facts at ¶ 19. The 2BUL cables have an insulation resistance of 400V. Def. Facts at ¶ 21; Pl. Resp. Def. Facts at ¶ 21. Cyber Power markets the 2BUL cables to "connect a power adapter to a desktop ONT." Def. Facts at ¶ 22 (citing Pl. Facts Ex. C. at 110); Pl. Resp. Def. Facts at ¶ 22.

Court No. 21-00200                                                                                          Page 7

The BRL cables are three feet long and contain two copper conductors.  Def. Facts at ¶¶ 23–24; Pl. Resp. Def. Facts at ¶¶ 23–24.  Both conductors transmit power from the BBU to the ONT, and the BRL cables do not contain a separate signal conductor.  Def. Facts at ¶ 24; Pl. Resp. Def. Facts at ¶ 24.  Cyber Power markets the BRL cables as designed to connect a BBU to a desktop ONT.  Def. Facts at ¶ 27 (citing Pl. Facts Ex. B at 113); Pl. Resp. Def. Facts at ¶ 27.

The 7PIN cables are available in lengths of two, four, six, or ten feet and contain seven copper conductors.  Def. Facts at ¶¶ 28–29; Pl. Resp. Def. Facts at ¶¶ 28–29.  Two thicker conductors supply power from the BBU to the ONT, and the remaining five thinner conductors transmit signals from the BBU to the ONT.  Def. Facts at ¶¶ 29–30; Pl. Resp. Def. Facts at ¶¶ 29–30.  Through those signal conductors, the BBU transmits messages to the ONT, including "on battery," "battery missing," "replace battery," and "low battery."  Def. Facts at ¶¶ 31–35; Pl. Resp. Def. Facts at ¶¶ 28–29.  One of the five signal conductors serves as a return conductor for the other four signal transmissions.  Def. Facts at ¶ 35; Pl. Resp. Def. Facts at ¶ 35.

## JURISDICTION AND STANDARD OF REVIEW

This Court has exclusive jurisdiction over "any civil action commenced to contest the denial of a protest, in whole or in part, under Section 515 of the Tariff Act

Court No. 21-00200                                                    Page 8

of 1930."[10]  28 U.S.C. § 1581(a).  The Court reviews the denied protest de novo "upon the basis of the record made before the [C]ourt."  28 U.S.C. § 2640(a)(1).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  A party opposing summary judgment must identify sufficient evidence supporting the asserted factual dispute to require a factfinder to resolve competing versions of the truth at trial.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986); Processed Plastic Co. v. United States, 473 F.3d 1164, 1170 (Fed. Cir. 2006); Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 835–36 (Fed. Cir. 1984).[11]   Where no genuine dispute exists as to the nature of the subject merchandise, the remaining question is a question of law reviewed de novo.  Well Luck Company, Inc. v. United States, 887 F.3d 1106, 1110 (Fed. Cir. 2018).

---

[10]   Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.  See 19 U.S.C. (2018).

[11]   See USCIT R. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact").

Case 1:21-cv-00200-CRK    Document 85    Filed 04/23/26    Page 9 of 29

Court No. 21-00200                                                    Page 9

## DISCUSSION

Cyber Power argues that the cables are classified under subheading 8544.42.20, HTSUS, duty free, and excluded from Section 301 duties under subheading 9903.88.33, HTSUS, because the cables are those "of a kind used for telecommunications." Pl. Mot. at 8–9, 18. CBP argues that the cables are properly classified under subheading 8544.42.90, HTSUS, as "other" cables, subject to a 2.6 percent ad valorem duty, and subheading 9903.88.03, HTSUS, with 10 or 25 percent ad valorem Section 301 duties because the cables are not those "of a kind used for telecommunications."[12] Def. Mot. at 13–15. Cyber Power further argues that, in the event the Court finds the cables are classified under subheadings 8544.42.90, HTSUS and 9903.88.03, HTSUS, the Court cannot impose the 2.6 percent ad valorem duties otherwise due under subheading 8544.42.90, HTSUS, because doing so would require the Court to levy an unconstitutional tax. Pl. Resp. at 11–15. The cables are not those "of a kind used for telecommunication," and therefore are properly classified under subheadings 8544.42.90 and 9903.88.03, HTSUS. Nonetheless, the statutory scheme does not provide for CBP to reliquidate the entries and collect any additional duties which would have been due had CBP entered or reliquidated them under the proper subheading. Thus, Cyber Power's motion for summary judgment is granted

---

[12] The two entries that were entered before May 10, 2019, would be subject to 10 percent ad valorem duties and the eight entries entered after May 10, 2019 would be subject to 25 percent ad valorem duties because of a subsequent change in Section 301 rates. See Compl. at ¶ 10.

Court No. 21-00200                                                      Page 10

in part and denied in part and CBP's motion for summary judgment is granted in

part and denied in part.

## I.    The Classification of the Cables

Plaintiff contends that CBP correctly classified the imported cables under

subheading 8544.42.20, HTSUS, but improperly imposed Section 301 duties under

subheading 9903.88.03, HTSUS, because the cables qualified for exclusion from those

duties under subheading 9903.88.33, HTSUS.  Pl. Mot. at 1.  In its cross-motion for

summary judgment, Defendant contends that Cyber Power's cables are not cables "of

a kind used for telecommunications" within the meaning of subheading 8544.42.20,

HTSUS, and are instead properly classified under subheading 8544.42.90, HTSUS,

as "other" cables, which are not eligible for exclusion from Section 301 duties.[13]  Def.

Mot. at 10.  The subject cables are not those "of a kind used for telecommunications"

described under subheading 8544.42.20, HTSUS, and are therefore properly

classified under residual heading 8544.42.90, HTSUS, as "other" cables.

---

[13] Defendant's motion for summary judgment contains a few apparent typographical errors in references to the subheading it contends is correct, referring at one point to subheading 8544.42.42 and elsewhere to 8544.42.29; neither of which are existing subheadings under the 2019 HTSUS. See Def. Mot. at ii, 2, 28.  The government also mistakenly cites to the relevant Section 301 exemption as Chapter 99 note 20(ii)(61), but the proper Chapter 99 note falls under 20(ii)(62). See id. at ii, iii, vi, 9, 13–15, 28–29.  In a written response to the Court's Oral Argument questions, Defendant corrected its errors and pointed out a typographical error in the HTSUS Chapter 99 note. See Response to Court Letter at 1–2, Jan. 22, 2026, ECF No. 81.  Accordingly, the Court acknowledges Defendant argues in favor of classification under subheading 8544.42.90, HTSUS and subheading 9903.88.03, HTSUS.

Court No. 21-00200                                                              Page 11

The HTSUS governs the classification of merchandise imported into the United States and organizes merchandise into headings that identify "general categories of merchandise" and subheadings that "provide a more particularized segregation of goods within each category."[14] See Dependable Packaging Solutions, Inc. v. United States, 757 F.3d 1374, 1377 (Fed. Cir. 2014). Additionally, the General Rules of Interpretation ("GRI"), applied in numerical order, provide for the proper tariff classification of merchandise under the HTSUS. See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999). GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes," which constitute binding statutory authority. GRI 1, HTSUS; see also BenQ Am. Corp. v. United States, 646 F.3d 1371, 1376 (Fed. Cir. 2011). Tariff terms are "construed according to their common and commercial meanings." Well Luck, 887 F.3d at 1111 (quoting Carl Zeiss, Inc., 195 F.3d at 1379). The Court may consult "lexicographic and scientific authorities, dictionaries and other reliable information" and rely on "its own understanding of the terms." Carl Zeiss, 195 F.3d at 1379. To determine the scope or meaning of tariff terms, the Court may also consult the Explanatory Notes ("ENs") to the HTSUS, which, although nonbinding, provide

---

[14] The classification of goods under the HTSUS is a two-step process. Well Luck, 887 F.3d at 1110 (citing Sigma-Tau HealthSci., Inc. v. United States, 838 F.3d 1272, 1276 (Fed. Cir. 2016)). First, the Court determines, de novo, the proper meaning and scope of the terms in the relevant tariff provision, which is a question of law, then the Court determines whether the subject merchandise falls within the relevant tariff provision, which is a question of fact. Well Luck, 887 F.3d at 1110 (citing Sigma-Tau, 838 F.3d at 1276).

"persuasive guidance and are generally indicative of the proper interpretation."

Chemtall, Inc. v. United States, 878 F.3d 1012, 1019 (Fed. Cir. 2017); see also USR

Optonix, Inc. v. United States, 362 F. Supp. 2d 1365, 1369 (Ct. Int'l Trade 2005).  The

Court must determine the correct classification, even if the correct classification is

not one proffered by the parties, Jarvis Clark Co. v. United States, 733 F.2d 873, 877–

78 (Fed. Cir. 1984).

A classification analysis may require the Court to determine whether the

relevant subheading constitutes an eo nomine provision or a use provision.  Ford

Motor Co. v. United States, 926 F.3d 741, 750 (Fed. Cir. 2019) (citing Schlumberger

Tech. Corp. v. United States, 845 F.3d 1158, 1164 (Fed. Cir. 2017)).  A tariff provision

which classifies merchandise by use implicates Additional Rule of Interpretation

("ARI") 1(a).  Dependable Packaging, 757 F.3d at 1378.  ARI 1(a) provides:

> In the absence of special language or context which otherwise requires .
> . . a tariff classification controlled by use (other than actual use) is to be
> determined in accordance with the use in the United States at, or
> immediately prior to, the date of importation, of goods of that class or
> kind to which the imported goods belong, and the controlling use is the
> principal use.

ARI 1(a), HTSUS.   The "controlling use" is the use "which exceeds any other single

use" of the imported good.  Aromont USA, Inc. v. United States, 671 F.3d 1310, 1312

(Fed. Cir. 2012) (quoting Lenox Collections v. United States, 20 C.I.T. 194, 196 (Ct.

Int'l Trade 1996)).  Where imported merchandise has more than one use, or may be

put to "some atypical use," the Court must determine whether the merchandise's use

which "exceeds any other single use" is the same use delineated in the provision.  See

Court No. 21-00200                                                        Page 13

Primal Lite, Inc. v. United States, 182 F.3d 1362, 1364–65 (Fed. Cir. 1999) (the

purpose of a use provision is to narrow the scope of classification); see also BenQ

America Corp. v. United States, 646 F.3d 1371, 1380 (Fed. Cir. 2011).

In analyzing imported goods' principal use, the Court asks whether the

imported goods are "commercially fungible" with the class or kind of goods described

in the use provision. See Aromont, 671 F.3d at 1312 (citing Primal Lite, 182 F.3d at

1365). The Court may use the "Carborundum factors" to assess commercial

fungibility where the subject merchandise has more than one use, to determine which

use is "controlling."[15]  See Aromont, 671 F.3d at 1312–13 (citing United States v.

Carborundum Co., 536 F.2d 373, 377 (C.C.P.A. 1976)); see, e.g., Dependable

Packaging, 757 F.3d at 1380–83 (applying the Carborundum factors where imported

goods were used for both decoration without flowers and to hold flowers); see also

Aromont, 671 F.3d at 1314–16 (using the Carborundum factors to determine the

principal use where the imported good was a flavoring product that was used for both

preparation of broths and as seasoning for other foods, generally); see also S.C.

---

[15] The Carborundum factors include:

> [The] use in the same manner as merchandise which defines the class;
> the general physical characteristics of the merchandise; the economic
> practicality of so using the import; the expectation of the ultimate
> purchasers; the channels of trade in which the merchandise moves; the
> environment of the sale, such as accompanying accessories and the
> manner in which the merchandise is advertised and displayed; and the
> recognition in the trade of this use.

Aromont, 671 F.3d at 1312–13 (citing Carborundum Co., 536 F.2d at 377).

Court No. 21-00200                                                    Page 14

Johnson & Son, Inc. v. United States, 415 F. Supp. 3d 1373, 1385–88 (Ct. Int'l Trade

2019), aff'd, 999 F.3d 1382 (Fed. Cir. 2021) (applying the Carborundum factors where

subject plastic sandwich bags could be used within the household for food storage or

to move smaller items from one place to another).

A use provision limits membership in the class of goods to "the particular

species of which the merchandise is a member" not the "much broader genus to which

that species belongs."  See Primal Lite, 182 F.3d at 1364 (explaining that although

the electric stranded garlands form the genus of merchandise, the phrase "of a kind

used for Christmas trees" limits the provision to the species of garlands "principally

used" for Christmas trees).  Primal Lite instructs that the phrase "of a kind," denoting

a use provision, does not authorize the Court or CBP to define the provision by

broader characteristics than the use provision's language itself provides.  See id.

(rejecting a broader reading because it would permit CBP to expand the scope of a

use provision beyond the limits imposed by the statutory language).

Here, beginning with GRI 1, the terms of the relevant headings are found in

HTSUS Section XVI, which covers "Machinery and Mechanical Appliances; Electrical

Equipment; Parts Thereof; Sound Recorders and Reproducers, Television Image and

Sound Recorders and Reproducers, and Parts and Accessories of Such Articles."

HTSUS Section XVI, HTSUS (2019).  Within Section XVI, chapter 85 applies to

"electrical  machinery  and  equipment  and  parts  thereof;  sound  recorders  and

Court No. 21-00200                                                      Page 15

reproducers, television image and sound recorders and reproducers, and parts and

accessories of such article." Ch. 85, HTSUS. Heading 8544, HTSUS provides:

> 8544 Insulated (including enameled or anodized) wire, cable (including coaxial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors or fitted with connectors.

Heading 8544, HTSUS.[16]

Within subheading 8544.42, HTSUS, the two potential eight-digit subheadings

under which the cables may fall are:

| | |
|---|---|
| 8544.42 | Other electric conductors, for a voltage not exceeding 1,000V: |
| 8544.42.20 | Other:<br>    Of a kind used for telecommunications |
| 8544.42.90 | Other |

---

[16] The parties do not dispute, and the Court agrees, that the cables are properly classified under chapter 85. See generally Def. Mot.; Pl. Mot. The cables are "accessories" to electrical machinery and equipment and are not covered by any other HTSUS chapter. Pl. Facts at ¶¶ 9, 16; Def. Facts at ¶ 4. Each of the cables contains copper conductors that carry electrical current and are insulated with polyvinyl chloride. Pl. Facts at ¶ 4(a), (c); Def. Resp. Pl. Facts at ¶ 4(a), (c); Pl. Mot. at 5; Def. Mot. at 3. Each cable is fitted with connector plugs at both ends, carries an electric current at a maximum voltage between 300 to 400 volts, and does not fall within any other six-digit HTSUS subheading. Pl. Facts at ¶¶ 4(d), 16; Def. Facts at ¶¶ 11, 16, 20, 21, 26, 38; see subheading 8544.42, HTSUS. The parties likewise agree, and the Court concludes, that the cables are properly classified under heading 8544. See generally Pl. Mot.; Def. Mot. The parties do not dispute, and the Court agrees, that the cables are properly classified under subheading 8544.42, HTSUS, which covers "other electric conductors, for a voltage not exceeding 1,000V: fitted with connectors." See generally Pl. Mot.; Def. Mot.

Court No. 21-00200                                                                Page 16

Subheadings 8544.42.20; 8544.42.90, HTSUS.  Subheading 8544.42.20, HTSUS is a

principal use heading, where Subheading 8544.42.90 is a residual or "basket"

heading.   Subheadings 8544.42.20; 8544.42.90. Goods defined under subheading

8544.42.20, HTSUS, as those "of a kind used for telecommunications" are exempt

from Section 301 duties pursuant to subheading 9903.88.33, HTSUS.[17]

Subheading 8544.42.20, HTSUS, turns on whether the cables are "of a kind

used for telecommunications."  Subheading 8544.42.20; see also Primal Lite, 182 F.3d

at 1364.  The term "telecommunications" means the conveyance of information over

a distance by means of electromagnetic mechanisms.  See Telecommunications,

Oxford                          English                          Dictionary,

https://www.oed.com/dictionary/telecommunication_n?tl=true (last visited, Apr. 21,

---

[17]  To determine the applicable Section 301 duty for merchandise classified under
subheading 8544.42.20, HTSUS, the HTSUS cross-references subheading
9903.88.03, HTSUS.  Subheading 9903.88.03, HTSUS, imposes a 10 percent ad
valorem duty for goods entered before May 10, 2019, and a 25 percent ad valorem
duty for goods entered after May 10, 2019 that are classified under subheading
8544.42, HTSUS,  "except as provided in headings . . . 9903.88.33."  See Subheading
9903.88.03, HTSUS.  Subheading 9903.88.33, in turn, sets out exclusions granted by
the U.S. Trade Representative that are identified in the chapter notes, including an
exclusion for "insulated electric conductors for a voltage not exceeding 1,000V, fitted
with connectors, of a kind used for telecommunications, each valued over $0.35 but
not over $2 (described in statistical reporting number 8544.42.20)" from China.  See
Subheading 9903.88.33, HTSUS.   Subheading 9903.88.33, HTSUS provides
exclusions to the Section 301 duties imposed by subheading 9903.88.03, HTSUS,
including an exclusion for "insulated electric conductors for a voltage not exceeding
1,000V, fitted with connectors of a kind used for telecommunications, each valued
over $0.35 but not over $2 (described in statistical reporting number 8544.42.20)"
from China.  See subheading 9903.88.33; HTSUS ch. 99, U.S. note 20(ii)(62) (2019).

Court No. 21-00200                                                    Page 17

2026) ("the transmission or exchange of information over a distance using electrical, radio, optical or other electromagnetic signals, as by telegraph, telephone, radio, television . . . the internet, etc.").[18]

The ENs to 8544 suggest that subheading 8544.42.20, HTSUS, encompasses only telecommunications cables, not all cables that may transmit a signal. Explanatory Notes to the Harmonized Commodity Description and Coding Sys., 85.44, (2009) ("8544 ENs").  It provides:

> [T]elecommunications wires and cables (including submarine cables and data transmission wires and cables) are generally made up of a pair, a quad, or a cable core, the whole usually covered with a sheath. A pair or a quad consists of two or four insulated wires, respectively (each wire is made up of a single copper conductor insulated with a coloured material of plastics having a thickness not exceeding 0.5 mm), twisted together. A cable core consists of a single pair or quad or multiple stranded pairs or quads.

---

[18] There is little disagreement between the parties regarding the term telecommunications.  See Pl. Mot at 11–12, Def. Mot. at 17–18; see also Telecommunications, Cambridge Essential British English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/telecommunications (last visited, Apr. 21, 2026) ("the sending or receiving of messages over distance, especially by phone, radio and television"); see also Telecommunication, Merriam-Webster, https://www.merriam-webster.com/dictionary/telecommunications (last visited Apr. 21, 2026) ("either communication at a distance" or "technology that deals with telecommunication."); Int'l Telecommunications Union, Radio Regul., art. 1.3 (2024) https://www.itu.int/hub/publication/r-reg-rr-2024/ (last visited Apr. 21, 2026) ("any transmission, emission, or reception of signs, signals, writings, images and sounds or intelligence of any nature by wire, radio, optical or other electromagnetic systems").

Court No. 21-00200                                                    Page 18

8544 ENs.   The ENs describe telecommunications cables and give examples of submarine cables and data transmission wires and cables, but say nothing of cables that are used to do something other than transmit a signal.[19] See id.  Thus, although the genus of cables included in subheading 8544.42, HTSUS, may be quite broad, the species of cable encapsulated by subheading 8544.42.20, HTSUS, includes only those cables that have a principal use of conveying messages over a distance by transmitting a signal.   See Subheading 8544.42.20, HTSUS, (referencing only telecommunications); 8544 ENs (same); Primal Lite, 182 F.3d at 1364 ("class or kind" refers to the species to which the imported goods belong, not to the genus).

The principal use, indeed, the only use, of the subject cables, is to keep the ONT connected to uninterrupted power.  The subject cables are not those "of a kind used for telecommunications" because although they transmit a signal, the signal functions to facilitate the transmission of power.  See Pl. Mot at 3–4; Def Mot. at 3–4.  The parties agree that the only use of the cables is to keep the ONT connected to uninterrupted power by transmitting power and sometimes do so by transmitting a

_____

[19] The ENs also explain that telecommunication cables are "generally made up of a pair, a quad, or a cable core . . . [consisting] of two or four insulated wires . . . twisted together.  A cable core consists of a single pair or quad or multiple stranded pairs or quads."  8544 ENs.  The undisputed physical characteristics of the subject cables do not indicate that the cables contain a pair, quad, or cable core of wires as described in the 8544 ENs.  See Def. Mot. at 5 (citing Pl. Facts at ¶ 19) (the BUL cables have three wires, only one of which carries a signal); Def. Mot. at 6 (citing Pl. Facts at ¶ 24) (the BRL cables contain two wires, neither of which carries a signal); Def Mot. at 6–7 (citing Pl. Facts at ¶¶ 34–35) (the 7PIN cables contain seven wires, only one of which carries a signal).

Court No. 21-00200                                                    Page 19

signal.  See Pl. Mot at 3–4; Def Mot. at 3–4; Oral Argument at 19:10–19:20, Mar. 3,

2026, ECF No. 83 ("Oral Argument").  See Pl. Mot at 3–4; Def Mot. at 3–4; Oral

Argument at 19:00–19:20, Mar. 3, 2026, ECF No. 83.[20]  The subject cables connect a

BBU to an ONT.  Pl. Mot. at 3–4; Def. Mot. at 3.  While the cables may transmit a

signal (i.e., a telecommunications function), subheading 8544.42.20, HTSUS, as a use

provision, does not extend to any cable that may transmit a signal.[21]  Because there

is no factual dispute regarding the use of the subject cables, and subheading

8544.42.20, HTSUS, does not extend to the broader category of cables used to

transmit power and sometimes transmit a signal, summary judgment on this issue is

appropriate in favor of the defendant.  See Well Luck, 887 F.3d at 1110.

Cyber Power argues that because the cables' ultimate use facilitates

telecommunications by connecting an ONT (which is used for telecommunications) to

an uninterrupted power source, the cables are "of a kind used for telecommunication."

Pl. Mot. at 13.  Cyber Power also argues that the cables are "solely bought by

telecommunications companies such as Verizon," and installed exclusively by

telecommunications companies for use alongside internet and phone service

technology.  Id. at 12–13.  Plaintiff's arguments are misplaced.  Subheading

---

[20] One of the subject cable models does not transmit a signal at all and only contains
wires that transmit power.  Pl. Facts at ¶ 24; Def. Facts at ¶ 24.

[21] To the extent there is a dispute regarding whether the transmission of power or
transmission of signal controls the use of the cables, that dispute is not the relevant
inquiry.  The parties do not dispute that all of the subject cables have a sole use:
providing uninterrupted power to the ONT from a BBU.  Pl. Mot. at 3, 13, 14; Def.
Mot. at 2, 3, 18–19, 22, 25; Oral Argument at 19:00–19:20.

Court No. 21-00200                                                                    Page 20

8544.42.20, HTSUS, does not extend to the broad genus of cables which are used "in" the telecommunications industry.[22]  That the subheading classifies cables of a kind used "for" telecommunications, rather than "in" telecommunications, indicates that the subheading does not include the genus of cables that could be utilized anywhere within the industry of telecommunications.  "For" as defined in the Oxford Dictionary is a preposition "expressing purpose," employed "with the object or purpose of."  For, Oxford                               English                               Dictionary, https://www.oed.com/dictionary/for_prep?tab=meaning_and_use#3986076        (last visited Apr. 21, 2026).  Meanwhile, the preposition "in" expresses something being situated "within the limits or bounds of, within (any place or thing)."  In, Oxford English                                                                   Dictionary, https://www.oed.com/dictionary/in_prep?tab=meaning_and_use#732036 (last visited Apr. 21, 2026).  Subheading 8544.42.20, HTSUS classifies only cables that are used for telecommunications, i.e., to convey a message and transmit a signal.  Subheading 8544.42.20,   HTSUS.    That   the   cables   are   ultimately   purchased   by telecommunications providers and used within the telecommunications industry does not indicate they are classified within the species of cables which are used to convey

---

[22] Cyber Power states, "[t]he requirement that a cable be 'of a kind used in telecommunications' does not mean that its use must be limited to transmission of voice, video or data.  Subheading 8544.42.20, HTSUS, does not say 'of a kind used for telecommunications.'" Pl. Resp. at 4 (emphasis in the original).  Cyber Power is wrong.  The text of subheading 8544.42.20 says "of a kind used for telecommunications." Subheading 8544.42.20, HTSUS (emphasis added).

Court No. 21-00200                                                                    Page 21

messages or transmit a signal.  Indeed, the parties agree that telecommunications companies who purchase the cables expect to use them to provide uninterrupted power to ONTs.[23]  See Pl. Mot. at 13; Def. Mot. at 22.  While the cables may appear within the telecommunications context, the only use of the cables is to provide uninterrupted power.

Likewise, the parties' arguments regarding the Carborundum factors are irrelevant in this case.  See Pl. Mot. at 14–18; Def. Mot. at 17–25.  The Carborundum factors are applicable to determine principal use where the subject merchandise has more than one use.  See Aromont, 671 F.3d at 1312–13; Dependable Packaging, 757 at 1378–79.

Because the subject cables have one undisputed use—providing uninterrupted power to an ONT—the cables cannot be classified as those "of a kind used for telecommunications."  The subject cables are therefore properly classified under subheading 8544.42.90, HTSUS, as "other."

## II.    Additional Duties

The Court's conclusion that the subject cables are properly classified under subheading 8544.42.90, HTSUS, not only affirms CBP's imposition of Section 301 duties under subheading 9903.88.03, HTSUS, but also raises the question of whether an additional 2.6 percent ad valorem duty, not originally imposed on the merchandise

---

[23] Verizon provided specifications for the cables in a request for proposal, describing them as power cables.  See Def. Mot. at 23 (citing Def. Facts at ¶ 45).

at liquidation, can be imposed on the Defendant.  Plaintiff argues that the Court does

not have the authority to impose an additional 2.6 percent ad valorem duty where it

was not originally imposed by the CBP and where Defendant did not bring a proper

counterclaim.  Pl. Resp. at 12.  Defendant argues that the Court's statutory obligation

to reach the correct result under Jarvis Clark necessarily allows the imposition of

higher duties where the result requires it.  Def. Reply in Supp. of Cross Mot. for

Summ. J. at 11–12, Dec. 22, 2025, ECF No. 75 ("Def. Reply") (citing Jarvis Clark, 733

F.2d at 877–78.  CBP lacks authority to claim increased duties or seek reliquidation

of the entries commensurate with the Court's classification.

Congress provided a comprehensive statutory scheme governing CBP's

classification of merchandise which provides both importers and CBP the opportunity

to challenge or correct improper classifications of merchandise.  See 19 U.S.C.

§§ 1504, 1514, 1515; 28 U.S.C. § 1581; see also Target Corporation v. United States,

134 F.4th 1307, 1314–15 (Fed. Cir. 2025) ("Congress has carefully crafted a statutory

scheme that specifically articulates grounds for [liquidation] finality and certain

exceptions to finality").  CBP has one year from the date of entry to liquidate an entry;

if it fails to do so within that period, the entry is "deemed liquidated" by operation of

law.  19 U.S.C. § 1504(a).  The statutory scheme also allows for CBP to voluntarily

reliquidate an entry, notwithstanding the filing of a protest, within 90 days of the

original liquidation.  19 U.S.C. § 1501.  Section 1514(a) provides an importer the right

to protest CBP's classification determinations within 180 days of liquidation of the

Court No. 21-00200                                                                    Page 23

entry.  19 U.S.C. § 1514(a).  Where CBP grants a timely protest, it will reliquidate

the entry, consistent with the corrected classification proffered by the importer.  19

U.S.C. § 1515.  Where CBP denies a timely protest, the importer may challenge the

denial by filing a claim at the U.S. Court of International Trade.  28 U.S.C. § 1581.

CBP can deny or grant a protest and re-liquidate in accordance with either its original

classification or the importer's proffered classification, but CBP lacks the statutory

authority to re-liquidate the entered merchandise under a provision neither asserted

by the importer nor applied by CBP at the time of entry after the 90-day voluntary

reliquidation period has passed.  See 19 U.S.C. §§ 1514; 1515; see also Target, 134

F.4th at 1314–15.

        This Court's authority is broader than that of CBP, but the Court must

nonetheless remain within the statutory confines set by Congress.  The Court is

tasked with finding the correct result and in doing so, exercises de novo review.  See

28 U.S.C. § 2643(b)–(c)(1); Jarvis Clark, 733 F.2d at 877–78.  Thus, in finding the

correct result, the Court may consider arguments made by the importer or the

government before the Court that were not made in the administrative proceeding.

28 U.S.C. § 2638 ("In any civil action under section 515 of the Tariff Act of 1930 in

which the denial, in whole or in part, of a protest is a precondition to the

commencement of a civil action in the Court of International Trade, the court, by rule,

may consider any new ground in support of the civil action if such new ground . . . (2)

is related to the same administrative decision listed in Section 514 of the Tariff Act

Court No. 21-00200                                                                     Page 24

of 1930 that was contested in the protest"). It is possible the Court may conclude that

the proper classification is one not asserted by the plaintiff nor the government. See

Well Luck, 887 F.3d at 1110 (classification questions are reviewed de novo); Jarvis

Clark, 733 F.2d at 877–78 (the Court must reach the correct result). For example,

in Kent Displays, the Court ordered CBP to re-liquidate under a subheading that was

neither the one imposed at liquidation nor the subheading offered in the importer's

protest. Kent Displays, Inc. v. United States, 698 F.Supp.3d 1339, 1352–53 (Ct. Int'l

Trade 2024). In Kent, the importer protested CBP's liquidation, on the ground that

CBP failed to apply an exemption from Section 301 duties granted by the U.S. Trade

Representative. Id. at 1344. CBP denied the protest, acknowledged the goods were

misclassified at liquidation, but identified a different heading altogether that would

not subject the goods to a Section 301 duty. Id. Though CBP recognized its mistake

at liquidation, it did not re-liquidate because there was no statutory basis for it to do

so where it was neither granting nor denying the importer's protest. Id. The importer

challenged the denial at the Court of International Trade, seeking re-liquidation

under either the original subheading, with the 301 exemption applied; or in the

alternative, under the subheading identified by CBP in the protest denial. Id. at

1345. CBP argued in favor of classification under the subheading identified in the

protest denial. Id. The Court concluded the correct classification was the one

identified by CBP in its denial of the importer's protest. Id. at 1353. The importer

Court No. 21-00200                                                          Page 25

had argued for classification under that subheading in the alternative, and the Court

ordered re-liquidation accordingly.  Id.

Although the Court must determine the correct classification for merchandise,

its authority to impose duties or order reliquidation of entries is not unlimited.  See

Target, 134 F.4th 1307.  The importer's protest in Kent precluded finality of the

liquidation as to the importer, allowing the Court to order reliquidation consistent

with its classification determination benefiting the importer.  Kent Displays, 698 F.

Supp. 3d at 1353.    However, in Target, liquidation had already become final as to

both CBP and the importer when CBP sought to revise an incorrect dumping duty

beyond the 90-day voluntary liquidation period.  134 F.4th at 1314–15.  CBP sought

relief from the CIT to order re-liquidation consistent with the Court's power to enforce

its prior judgment in an antidumping duty case.  Id.  The CIT entered an order

enforcing its prior judgment, directing CBP to re-liquidate the entries in accordance

with the correct classification.  Id.  The Court of Appeals reversed the CIT's order,

holding that the CIT, despite having inherent power to provide equitable remedies

and de novo review, cannot craft a remedy that circumvents the finality principles

outlined by Congress's statutory scheme.  Id.

Neither Target nor Kent confronts the set of circumstances that appear here.

In the instant case, the importer protested liquidation, forestalling finality.  However,

the classification sought by CBP, and determined by the Court to be correct, would

result in the importer owing additional duties.  The carefully crafted statutory

Court No. 21-00200                                                      Page 26

scheme precludes ordering the Plaintiff to pay additional duties. Cf. Target,134 F.4th

at 1314–15 (no statutory authority for the Court to order re-liquidation of entries

after liquidation has become final).  The statutory scheme provides that voluntary

reliquidation forestalls finality for CBP and a protest forestalls finality for the

importer.  19 U.S.C. §§ 1501; 1514; 1515.    Once liquidation is final for CBP the

Court's classification determination will not result in reliquidation. Cf. Target, 134

F.4th at 1314–15.

CBP argues that the Court has the power, under Jarvis Clark, to determine

the proper classification of the merchandise and order any form of relief related to

the proper classification under 28 U.S.C. § 2643.[24]  See Def. Reply at 9–10. Jarvis

Clark does not address payment of additional duties. See generally Jarvis Clark, 733

F.2d, 873. Rather, Jarvis Clark emphasizes upholding Congress's "desire for 'uniform

and consistent interpretation and application' of the customs laws." Id. at 876 (citing

---

[24] The government argues that the plain language of § 2643(a)(1), authorizing money judgments "for or against the United States," should be read to allow the Court to provide relief to the government even where the claim is brought by a plaintiff against the government. See Def. Reply at 9–10.  The full text of § 2643(a)(1) authorizes money judgments "for or against the United States in any civil action commenced under section 1581 or 1582 of this title." 19 U.S.C. § 2643(a)(1). Section 1581 grants the CIT jurisdiction over civil actions commenced by importers against the government, whereas § 1582 provides the CIT jurisdiction over civil actions commenced by the United States to recover penalties or duties from importers. See 28 U.S.C. § § 1581; 1582.  Thus, the authorization of money judgments "for or against the United States" in § 2643(a)(1) refers to the relief available to 1581 and 1582 claims, respectively, not the Court's ability to provide money judgments in favor of a defendant without a counterclaim. See 19 U.S.C. § 2643(a)(1).

Court No. 21-00200                                                          Page 27

H.Rep. No. 1235, 96th Cong., 2d Sess. 29, reprinted in 1980 U.S. Code Cong. & Ad. News 3729, 3741 (House Report)). [25]

Here, in fulfilling its duty to find the correct result under Jarvis Clark, the Court concludes that the merchandise should have been classified under the subheading 8544.42.90, HTSUS, which would have subjected the cables to a 2.6 percent ad valorem duty and subheading 9903.88.03, HTSUS subjects the cables to the Section 301 duties. At liquidation, CBP classified the cables under the ordinary HTSUS subheading 8544.42.20, as those "of a kind used for telecommunications," duty free, and at the same time, classified the cables under subheading 9903.88.03, HTSUS, imposing Section 301 duties rather than subheading 9903.88.33, HTSUS which provides for cables "of a kind used for telecommunications" and exempts the entries from Section 301 duties. Pl. Mot. at1–2; Def. Mot. at 7–8. Once the 90-day voluntary re-liquidation period had passed, CBP no longer had a statutory mechanism to correct the classification and impose the 2.6 ad valorem duty imposed

---

[25] Indeed, in Jarvis Clark, the issue was remanded to the CIT, where the Court remanded to the port director to classify in accordance with the decision. See Jarvis Clark, 733 F.2d at 881; Jarvis Clark Co. v. United States, 8 C.I.T. 280, 281 (Ct. Int'l Trade 1984). Neither the Court of Appeals nor the CIT remand directed CBP to re-liquidate the entries with the duties imposed by the proper classification. See Jarvis Clark, 733 F.2d at 881; Jarvis Clark, 8 C.I.T. 280.

Court No. 21-00200                                                        Page 28

by HTSUS subheading 8544.42.90.[26]  See generally, 19 U.S.C. §§ 1504, 1514; 1515;

28 U.S.C. § 1581.   CBP lacks a statutory basis upon which the Court could provide

CBP with the relief it seeks.[27]  See Cyber Power I, 586 F. Supp. 3d at 1331 n.10, 1333

(neither 28 U.S.C. § 2643 nor 19 U.S.C. § 1583 provides the government a statutory

basis for a claim for relief); Target, 134 F.4th 1307 (without statutory authority, the

Court cannot grant relief to CBP after liquidation is final).

## CONCLUSION

In accordance with the foregoing, Plaintiff's subject cables are not those of the

kind used for telecommunications and are therefore properly classifiable under

subheading 8544.42.90, HTSUS and additionally, under Section 301 subheading

9903.88.03, HTSUS.   Nonetheless, the time for CBP to reliquidate the entries with

additional duties has passed; therefore, CBP may not reliquidate the entries and

collect any additional duties which would have been due had CBP entered or

reliquidated them under the proper subheading.   Plaintiff's motion for summary

---

[26] CBP's apparent error imposing Section 301 duties under subheading 9903.88.03, HTSUS, however is correct, given that the correct classification of the cables is under subheadings 8544.42.90 and 9903.88.03, HTSUS.

[27] "Jarvis Clark, while mandating this court to determine the correct classification, cannot be said to contravene the Constitution's Article III mandate that courts not determine moot issues." Blue Sky The Color of Imagination, LLC v. United States, 50 CIT _, _, Slip. Op. 26-37 at 16 (Apr. 21, 2026) (citing Jarvis Clark Co. v. United States, 733 F.2d 873 (Fed. Cir. 1984); U.S. Const. Art. III § 2, cl. 1) (internal citations omitted).  Here, deciding the correct classification under Jarvis Clark is necessary to resolve the Plaintiff's claim that its merchandise was not properly subject to Section 301 duties.  See Compl. at ¶¶ 18, 19.  Thus, that the Court does not provide a monetary remedy to the Defendant does not render the decision an advisory one.

Court No. 21-00200                                                    Page 29

judgment is granted in part and denied in part and Defendant's cross motion for

summary judgment is granted in part and denied in part.  Judgment shall be entered

accordingly.

                                        /s/ Claire R. Kelly
                                        Claire R. Kelly, Judge

Dated:        April 23, 2026
              New York, New York